385 F.3d 1206
 The MINISTRY OF DEFENSE AND SUPPORT FOR THE ARMED FORCES OF THE ISLAMIC REPUBLIC OF IRAN, as Successor in Interest to the Ministry of War of the Government of Iran, Plaintiff-Appellee,
v.
CUBIC DEFENSE SYSTEMS, INC., as Successor in Interest to Cubic International Sales Corporation, Defendant,
v.
Stephen M. Flatow, Plaintiff-intervenor-Appellant, and
Dariush Elahi, Plaintiff-intervenor.
The Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran, as Successor in Interest to the Ministry of War of the Government of Iran, Plaintiff-Appellee,
v.
Cubic Defense Systems, Inc., as Successor in Interest to Cubic International Sales Corporation, Defendant,
v.
Stephen M. Flatow, Plaintiff-intervenor-Appellant, and
Dariush Elahi, Plaintiff-intervenor.
The Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran, as Successor in Interest to the Ministry of War of the Government of Iran, Plaintiff-Appellant,
v.
Cubic Defense Systems, Inc., as Successor in Interest to Cubic International Sales Corporation, Defendant,
v.
Stephen M. Flatow, Plaintiff-intervenor, and
Dariush Elahi, Plaintiff-intervenor-Appellee.
 No. 99-56498.
 No. 02-57043.
 No. 03-55015.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 22, 2004.
 Filed October 7, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Appeal from the United States District Court for the Southern District of California; Rudi M. Brewster, District Judge, Presiding. D.C. Nos. CV-98-01165-B, CV-98-01165-RMB.
 Anthony J. Van Patten, Anthony J. Van Patten, Inc., Glendale, CA, and Mina Almassi, Los Altos, CA, for the Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran.
 Steven R. Perles, Perles Law Firm, P.C., Washington, DC (argued) and Thomas Fortune Fay, Washington, DC, for appellant Stephen Flatow.
 Jonathan R. Mook, DiMuro, Ginsberg & Mook, P.C., Alexandria, VA, (argued) and Philip J. Hirschkop, Hirschkop & Associates, P.C., Alexandria, VA, for appellee Dariush Elahi.
 Before: B. FLETCHER, WARDLAW, and FISHER, Circuit Judges.
 BETTY B. FLETCHER, Circuit Judge:
 
 
 1
 These consolidated appeals arise from attempts by Stephen Flatow ("Flatow") and Dariush Elahi ("Elahi") to collect on default judgments they obtained against the Islamic Republic of Iran ("Iran") in the United States District Court for the District of Columbia. That court found Iran liable for the terrorist acts that resulted in the deaths of Flatow's daughter and Elahi's brother. In both cases, the district court assessed substantial compensatory and punitive damages against Iran.
 
 
 2
 In the underlying case, Iran's Ministry of Defense ("MOD") successfully petitioned the District Court for the Southern District of California to confirm an arbitration award issued in its favor by the International Chamber of Commerce ("ICC"). The $2.8 million award had been issued against a supplier of military equipment, Cubic Defense Systems, Inc. ("Cubic"), and related to a claimed breach of contract by Cubic in providing military hardware to MOD. Shortly after the district court confirmed the arbitration award, Flatow moved to intervene in the case. The district court denied Flatow's motion, and that decision is the subject of the appeal in case No. 99-56498. Later, both Flatow and Elahi moved to attach MOD's judgment against Cubic. In turn, MOD moved the district court for a determination that its judgment against Cubic was immune from attachment. The district court granted MOD's motion with respect to Flatow, but denied it with respect to Elahi. Flatow and MOD appeal those determinations in case Nos. 02-57043 and 03-55015, respectively.
 
 JURISDICTION
 
 3
 The denial of a motion to intervene as of right is an appealable final order. Leisnoi, Inc. v. United States, 313 F.3d 1181, 1184 (9th Cir.2002). In addition, district court orders entered after the entry of judgment are generally reviewable by a separate appeal. See United States v. One 1986 Ford Pickup, 56 F.3d 1181, 1184-85 (9th Cir.1995). We therefore have jurisdiction over the consolidated appeals pursuant to 28 U.S.C. § 1291.
 
 BACKGROUND
 
 The Flatow Default Judgment
 
 
 4
 On April 10, 1995, Alisa Michelle Flatow, an American college student living in Israel, died of injuries she sustained as a result of a suicide bombing in the Gaza Strip. See Flatow v. Islamic Republic of Iran, 999 F.Supp. 1, 7-8 (D.D.C.1998). Her father, Stephen Flatow, later brought suit against Iran, its Ministry of Information and Security ("MOIS"), and various Iranian officials in the District Court for the District of Columbia.[1] The Iranian government and its officials did not enter an appearance, and the district court entered a default judgment against them on March 11, 1998. Id. at 6. Prior to entering judgment, however, the court conducted an evidentiary hearing and set forth detailed findings of fact and conclusions of law. The court found that Flatow had established his claim to relief in that the Iranian government and the other defendants had sponsored terrorist acts and performed acts which caused the death of Flatow's daughter.[2] Id. at 9-10. The district court also held that it had subject-matter jurisdiction over the action and personal jurisdiction over the defendants. Id. at 34. The judgment against the Iranian defendants was for $20,000,000 in compensatory damages and $250,000,000 in punitive damages. Id. at 32, 34.
 
 
 The Elahi Default Judgment
 
 
 5
 On October 23, 1990, Dr. Cyrus Elahi was assassinated in Paris, France. See Elahi v. Islamic Republic of Iran, 124 F.Supp.2d 97, 103 (D.D.C.2000). Dr. Elahi was a naturalized United States citizen and an important official in an Iranian opposition group working from France. Id. at 102-03. French authorities arrested a number of Iranian nationals, and determined that the assassination had been orchestrated by the Iranian government through MOIS. Id. at 104. In 2000, Dr. Elahi's brother, Dariush Elahi, filed suit against Iran and MOIS in the District Court for the District of Columbia. As with the Flatow case, the Iranian government did not enter an appearance with that court, and the court therefore entered a default judgment in favor of Elahi in December 20, 2000. Id. at 99-100. Before entering judgment, the district court issued findings of fact and conclusions of law. The judgment against Iran was for compensatory damages in the amount of $11,740,035, and punitive damages of $300,000,000. Id. at 115.
 
 
 The Case Against Cubic Defense Systems
 
 
 6
 In October 1977, MOD's predecessor entered into a pair of contracts with Cubic, a California-based defense firm, relating to the sale and servicing of an Air Combat Maneuvering Range ("ACMR") for use by the Iranian Air Force. Ministry of Def. v. Cubic Def. Systems, Inc., 29 F.Supp.2d 1168, 1170 (S.D.Cal.1998). Following the Iranian revolution of 1979, the delivery of the ACMR did not take place for reasons that the two parties dispute. See id. In September 1991, and pursuant to the terms of the contracts, MOD filed a request for arbitration with the ICC in Zurich, Switzerland. Id. After submissions from both MOD and Cubic, the ICC ruled in favor of MOD and issued a Final Award requiring Cubic to pay MOD $2.8 million. Id. at 1171.
 
 
 7
 In June 1998, MOD filed a petition in the District Court for the Southern District of California to confirm the award entered by the ICC pursuant to the New York Convention.[3] Id. at 1170. After reviewing Cubic's arguments in opposition, the district court granted MOD's petition and confirmed the ICC Award on December 7, 1998. Id. at 1174.[4] Both Cubic and MOD took cross appeals of the district court's decision, and those appeals remain pending.
 
 
 8
 On February 1, 1999, Flatow filed a Motion for Leave to Intervene in the district court. Flatow pointed out that he had obtained a Summons in Garnishment directed at Cubic from the District Court for the Eastern District of Virginia, and that he expected to receive an Order of Condemnation from that court as to MOD's cause of action in the Cubic case. The district court denied Flatow's motion on April 6, 1999, finding that, under Rule 24(a)(2) of the Federal Rules of Civil Procedure, the motion was untimely and Flatow had failed to establish "an interest relating to the property or transaction which is the subject matter of the litigation." On June 10, 1999, Flatow filed a motion for reconsideration of the district court's decision, but the district court denied the motion on August 10, 1999. Flatow filed a notice of appeal from the denial of his motion for reconsideration on September 9, 1999. We heard oral arguments on this appeal (99-56498) on December 6, 2001, but vacated submission of the case pending the resolution of a motion by MOD to dismiss the appeal. MOD claimed that Flatow's acceptance of payments under the Victims of Trafficking and Violence Protection Act of 2000 rendered him unable to collect against the Cubic judgment. We directed that MOD's motion to dismiss be filed in the district court and stayed the intervention appeal pending that court's decision.
 
 
 9
 At the same time that Flatow's motion to intervene was being rejected, Flatow filed a notice of lien with the district court on April 27, 1999. The notice indicated that Flatow had registered his default judgment against Iran in the Southern District of California, and claimed that any monies to be distributed as part of the Cubic judgment should be directed to him. A similar notice of lien was filed by Elahi on November 1, 2001.
 
 
 10
 On September 13, 2002, MOD filed motions seeking a judicial determination that its judgment against Cubic Defense Systems was immune from attachment by both Flatow and Elahi. The district court heard oral argument on the motion on October 28, 2002, and rendered its decision on November 26, 2002. The district court granted MOD's motion as to Flatow and ordered the striking of Flatow's notice of lien, but it denied the motion as to Elahi, finding that MOD's judgment was not immune from attachment by Elahi. Ministry of Def. v. Cubic Def. Systems Inc., 236 F.Supp.2d 1140, 1152 (S.D.Cal.2002) (hereinafter "District Court Order"). Both Flatow and MOD filed timely appeals.
 
 DISCUSSION
 
 11
 I. The Denial of Flatow's Motion to Intervene
 
 
 12
 We examine first the district court's decision to deny Flatow's motion to intervene as of right under Rule 24(a)(2) of the Federal Rules of Civil Procedure in the underlying litigation between MOD and Cubic. Ordinarily, we review the denial of a motion to intervene de novo. See Arakaki v. Cayetano, 324 F.3d 1078, 1082 (9th Cir.2003). However, Flatow's appeal is not from the denial of the motion to intervene itself but from the denial of his motion for reconsideration of that decision. We therefore review for an abuse of discretion. Smith v. Pac. Properties Dev. Corp., 358 F.3d 1097, 1100 (9th Cir.2004).
 
 
 13
 We have previously explained that an applicant for intervention as of right under Rule 24(a)(2) must comply with the following four requirements:
 
 
 14
 (1) the application for intervention must be timely;
 
 
 15
 (2) the applicant must have a "significantly protect able" interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by the existing parties in the lawsuit.
 
 
 16
 Southwest Ctr. for Biological Diversity v. Berg, 268 F.3d 810, 817 (9th Cir.2001). In this case, the district court denied Flatow's motion for leave to intervene on the grounds that the motion was untimely and that Flatow had failed to establish an interest relating to the property or transaction which is the subject matter of litigation.
 
 
 17
 We conclude that the district court did not abuse its discretion in refusing to reconsider its determination regarding Flatow's motion to intervene. Flatow claimed to meet the "significantly protectable interest" prong of the Rule 24(a)(2) test because he is a judgment creditor of MOD and therefore has an interest in ensuring he is able to collect on his judgment. Our court has already rejected this line of argument, however, in a decision issued after the briefs were filed in these appeals. See United States v. Alisal Water Corp., 370 F.3d 915, 920-21 (9th Cir.2004). In Alisal Water, we explained that the mere interest in the prospective collectability of a debt is insufficient to satisfy the requirements of Rule 24(a)(2), unless that interest is related to the underlying subject matter of the action. In this case, Flatow asserts no interest related to the underlying dispute between MOD and Cubic. Therefore, under Alisal Water, the district court properly rejected Flatow's attempt to intervene as of right in the underlying litigation.[5]
 
 
 18
 We affirm the district court's denial of Flatow's motion for reconsideration.
 
 II. Flatow's Waiver of Claims Against Iran
 
 19
 MOD argues that Flatow has waived any claim that he may have had on the Cubic judgment through his acceptance of payments under section 2002 of the Victims of Trafficking and Violence Protection Act of 2000, Pub.L. No. 106-386, 114 Stat. 1464 ("Victims Protection Act"). The district court agreed with MOD and ordered the district court clerk to strike the lien that Flatow had placed on the Cubic judgment. District Court Order at 1152. Because the district court's decision presents purely legal questions, we review it de novo. Ballaris v. Wacker Siltronic Corp., 370 F.3d 901, 910 (9th Cir.2004).
 
 
 20
 In enacting section 2002 of the Victims Protection Act, Congress created a mechanism through which individuals holding judgments against Iran or Cuba, based on those nations' sponsorship of terrorist activity, could collect damages from a special fund established by the United States government. Claimants had to choose between either (a) recovering 110 percent of the compensatory damages awarded in the judgment in return for relinquishing any rights as to compensatory or punitive damages, or (b) recovering 100 percent of the compensatory damages and relinquishing all rights as to compensatory damages but relinquishing only certain rights as to the punitive damages portion of their judgment. Victims Protection Act sections 2002(a)(1) and (a)(2). Claimants choosing option (b) would be required to relinquish "all rights to execute against or attach property that is at issue in claims against the United States before an international tribunal, that is the subject of awards rendered by such tribunal, or that is subject to section 1610(f)(1)(A) of title 28, United States Code." Victims Protection Act section 2002(a)(2)(D).
 
 
 21
 Neither Flatow nor MOD disputes that Flatow opted for option (b) under the Victims Protection Act and that he therefore received a payment of 100 percent of the compensatory damages he was awarded in the default judgment issued by the District Court for the District of Columbia. What the parties do dispute is the breadth of the relinquishment provision quoted above and whether it covers the judgment MOD obtained against Cubic. MOD does not argue that the Cubic judgment is either at issue in claims before an international tribunal or the subject of awards rendered by such a tribunal. Instead, MOD claims that the Cubic judgment is "property ... that is subject to [28 U.S.C. § 1610(f)(1)(A)]." Determining the viability of MOD's claim requires us to follow a labyrinthine path through several statutes and regulations.
 
 
 22
 Title 28 U.S.C. § 1610(f)(1)(A) provides that
 
 
 23
 Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C.App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701-1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such property is not immune under section 1605(a)(7).
 
 
 24
 MOD argues that the Cubic judgment is subject to this provision because it is "property with respect to which financial transactions are prohibited or regulated pursuant to ... sections 202 and 203 of the International Emergency Economic Powers Act [("IEEPA")]" or regulations issued pursuant to those sections.
 
 
 25
 We therefore turn to sections 202 and 203 of the IEEPA, which generally provide authority for the President to regulate financial transactions and other transfers of property involving a foreign country when he declares a national emergency with respect to any "unusual and extraordinary threat" emanating from outside the United States. See IEEPA section 202, 50 U.S.C. § 1701. As relevant here, section 203 of the IEEPA provides that "the President may, under such regulations as he may prescribe ... regulate ... any transactions involving[] any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1).[6] The President has exercised this authority with respect to Iran since 1979, when President Carter declared a national emergency with respect to that country in response to the taking of hostages in the United States Embassy in Tehran. See Exec. Order No. 12,170, 44 Fed.Reg. 65,729 (Nov. 14, 1979). Pursuant to that and subsequent declarations,[7] the President — through the Department of the Treasury — has established two regulatory schemes relating to transactions involving Iran: the Iranian Assets Control Regulations ("IACR"), 31 C.F.R. pt. 535 (2003), which regulate transactions involving Iranian property subject to United States jurisdiction, and the Iranian Transactions Regulations ("ITR"), 31 C.F.R. pt. 560, which regulate trade and financial transactions between United States entities and Iran.[8] See Flatow v. Islamic Republic of Iran, 305 F.3d 1249, 1255 (D.C.Cir.2002). Only the IACR are relevant to our analysis of this aspect of the case.
 
 
 26
 Title 31 C.F.R. § 535.201 provides that No property subject to the jurisdiction of the United States or which is in the possession of or control of persons subject to the jurisdiction of the United States in which on or after [November 14, 1979] Iran has any interest of any nature whatsoever may be transferred, paid, exported, withdrawn or otherwise dealt in except as authorized.
 
 
 27
 Section 535.311 defines "property" for purposes of § 535.201 to include "judgments." The combination of these regulations makes clear that the Cubic judgment is property regulated by the IACR and that the IACR have been enacted pursuant to sections 202 and 203 of IEEPA. This means, in turn, that the Cubic judgment is "subject to" 28 U.S.C. § 1610(f)(1)(A), as provided for in the Victims Protection Act, and that Flatow therefore relinquished all rights to execute against or attach that judgment when he received payments under the Act.
 
 
 28
 Flatow's arguments against this conclusion are unavailing. Flatow first claims that reading the relevant statutes and regulations to preclude attachment of the Cubic judgment would create a conflict between the Victims Protection Act and the duties embodied in the New York Convention to enforce foreign arbitral awards. The New York Convention, however, has been fully enforced in this case; the district court has confirmed the ICC award obtained by MOD against Cubic. See Ministry of Def. v. Cubic Def. Systems, Inc., 29 F.Supp.2d 1168 (S.D.Cal.1998). The award has, in essence, been transformed into a judgment of a federal court, and the New York Convention is now irrelevant to whether that judgment can be attached by a third-party.[9] Cf. Victrix S.S. Co. v. Salen Dry Cargo A.B., 825 F.2d 709, 713 n. 2 (2d Cir.1987) ("[T]he [New York] Convention does not apply to the enforcement of judgments that confirm foreign arbitration awards.").
 
 
 29
 Flatow's second argument is that the Cubic judgment is not currently "regulated" by the IEEPA. Flatow points out that 31 C.F.R. § 535.579(a)(2) provides that "[t]ransactions involving property in which Iran or an Iranian entity has an interest are authorized where ... [t]he interest in the property of Iran or an Iranian entity ... arises after January 19, 1981." This provision is one of several general licenses which authorize particular categories of transactions involving Iranian property. See 31 C.F.R. §§ 535.504-535.580; see also 31 C.F.R. § 501.801(a) (defining general licenses). Flatow contends that § 535.579(a)(2) is applicable to the Cubic judgment because it is property in which MOD gained an interest after January 19, 1981. With this much we agree. See section III. D., infra. Flatow further contends, however, that § 535.579 "deregulates" the Cubic judgment, so as to render it property not subject to regulation under IEEPA. With this proposition we cannot agree. As noted earlier, 31 C.F.R. § 535.201 prohibits any dealings in Iranian property subject to the jurisdiction of the United States "except as authorized." Section 535.579 then "authorize[s]" transactions involving certain property, including the Cubic judgment. The fact that a range of conduct is authorized or permitted does not mean that it is not regulated; to the contrary, the fact that § 535.579 purports to authorize transactions related to the Cubic judgment reinforces the notion that the judgment is property regulated by the Iranian regulations and IEEPA. See Flatow, 305 F.3d at 1255 ("The fact that a transaction is authorized by an OFAC license confirms that it is `regulated' by IEEPA and by regulations or licenses issued pursuant thereto."). We note, for instance, that any transactions involving the Cubic judgment remain subject to the record-keeping requirements set out at 31 C.F.R. § 501.601.[10] Moreover, our reading of the relevant statutes and regulations is the one adopted by OFAC,[11] which is charged with administering the Iranian regulations, and OFAC's interpretation is entitled to deference. See Consarc Corp. v. United States Treasury Dep't, Office of Foreign Assets Control, 71 F.3d 909, 914 (D.C.Cir.1995) (holding that OFAC is entitled to Chevron deference in its interpretations of IEEPA). For these reasons, we reject Flatow's contention that § 535.579 or any other general or specific licenses render the Cubic judgment not "regulated" by IEEPA.
 
 
 30
 Flatow's final argument is that our reading of the statutes and regulations would lead to an absurd result. Cf. United States v. Martinez-Martinez, 369 F.3d 1076, 1085 (9th Cir.2004) ("[A] statute must not be construed in a way that produces absurd results...."). Because virtually all Iranian property in the United States is regulated under IEEPA, Flatow argues that he may never be able to collect on the punitive portion of his default judgment. Flatow would therefore have given up a payment of 10 percent of his compensatory damages under the Victims Protection Act for a nonexistent possibility. We recognize that Flatow's ability to collect the punitive damages portion of his judgment is severely restricted under the scheme set up by Congress in the Victims Protection Act. We do not believe, however, that our reading of the statutes would lead to an absurd result; Flatow may yet be able to collect against Iranian property not subject to the Iranian regulations.[12] Moreover, at the time of Flatow's selection under the Victims Protection Act, Flatow was aware — or should have been aware — that his ability to collect the punitive damages portion of the default judgment would be quite limited. The notice implementing the payment scheme established by the Act warned claimants in Flatow's position of the consequences of retaining a right to pursue punitive damages:
 
 
 31
 Because of the comprehensive sanctions programs in place against Iran pursuant to IEEPA and against Cuba pursuant to TWEA, see 31 C.F.R. Parts 515, 535, and 560, virtually every transaction involving Iranian or Cuban property within the jurisdiction of the United States is either "prohibited" or "regulated," i.e., permitted only by a general license in regulations promulgated by the Office of Foreign Assets Control (OFAC), Department of the Treasury, or by a specific license issued by OFAC.... Thus, virtually all Iranian or Cuban property within the jurisdiction of the United States is "property with respect to which financial transactions are prohibited or regulated pursuant to" IEEPA or TWEA. Section 2002(a)(2)(D) [of the Victims Protection Act] therefore prohibits an applicant who elects the 100 per cent option from seeking to execute his or her punitive damage award against, or from seeking to attach, virtually all Iranian or Cuban assets within the jurisdiction of the United States.
 
 
 32
 Notice: Payments to Persons Who Hold Certain Categories of Judgments Against Cuba or Iran, 65 Fed.Reg. 70,382, 70,384 (Nov. 22, 2000) (emphasis added). The plain meaning of the statute and regulations precludes relief for Flatow.
 
 
 33
 We hold that Flatow relinquished any claim as to the Cubic judgment when he accepted payments under the Victims Protection Act.
 
 
 34
 III. Elahi's Ability to Attach the Cubic Judgment
 
 
 35
 It is undisputed that Elahi did not receive payments under the Victims Protection Act, so that issue does not apply to his case. MOD argues, however, that Elahi may not attach the Cubic judgment because he has not shown that any of the exceptions to foreign sovereign immunity from attachment set out in the Foreign Sovereign Immunities Act of 1976 ("FSIA" or "the Act"), 28 U.S.C. §§ 1602-1611, are applicable in this case. We review the existence of sovereign immunity de novo. See Park v. Shin, 313 F.3d 1138, 1141 (9th Cir.2002).
 
 
 36
 A. MOD's Purported Waiver of Sovereign Immunity
 
 
 37
 The district court found that sovereign immunity did not prevent Elahi from attaching the Cubic judgment because MOD had waived its immunity by both submitting to arbitration at the ICC and then seeking to have the ICC award confirmed in a federal court. As we explain below, the district court erred in this portion of its analysis by confounding two different aspects of foreign sovereign immunity.
 
 
 38
 The FSIA is "a comprehensive statute containing a set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities." Republic of Austria v. Altmann, ___ U.S. ___, 124 S.Ct. 2240, 2249, 159 L.Ed.2d 1 (2004) (quoting Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 488, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)) (internal quotations omitted). The FSIA codified the "restrictive" theory of foreign sovereign immunity, which held that a foreign sovereign's immunity is "confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." Verlinden, 461 U.S. at 487, 103 S.Ct. 1962. However, while the FSIA represented a significant development in how claims of foreign sovereign immunity are to be adjudicated in the courts of this country, it did not repeal the conceptual framework of foreign sovereign immunity as it had developed prior to the FSIA's passage. In particular, the FSIA preserved a distinction between two different aspects of foreign sovereign immunity: jurisdictional immunity — that is, a foreign sovereign's immunity from actions brought in United States courts — and immunity from attachment — a foreign sovereign's immunity from having its property attached or executed upon. See Conn. Bank of Commerce v. Republic of Congo, 309 F.3d 240, 252 (5th Cir.2002). The FSIA's structure demonstrates that it preserves the distinction between these two types of immunity. On the one hand, § 1604 establishes a default rule that a foreign sovereign will be immune from the jurisdiction of United States courts unless one of the exceptions set out in § 1605 applies; on the other hand, § 1609 provides that the property of foreign states and their instrumentalities will be immune from attachment and execution unless one of the exceptions set out in § 1610 applies. A foreign sovereign's waiver of immunity is one of the exceptions to both jurisdictional immunity and immunity from attachment. See 28 U.S.C. §§ 1605(a)(1), 1610(a)(1) and (b)(1).
 
 
 39
 Elahi contends that MOD's actions in seeking to confirm the ICC award against Cubic resulted in an implicit waiver of its foreign sovereign immunity.[13] We agree to the extent that Elahi is referring to MOD's jurisdictional immunity from suit. In other words, we agree that MOD implicitly waived its immunity from being subjected to the jurisdiction of United States courts when it sought to confirm the ICC award; in fact, MOD concedes as much. MOD Brief in no. 03-55015 at 6. The question we must address, however, is whether MOD's waiver of jurisdictional immunity also constituted a waiver of its immunity from attachment of its property under 28 U.S.C. §§ 1610(a)(1) or (b)(1).
 
 
 40
 Prior to the passage of the FSIA, the courts that had addressed this question had held that a foreign state's waiver of jurisdictional immunity did not constitute a waiver of its immunity from attachment of its property. See Flota Maritima Browning de Cuba, S.A. v. Motor Vessel Ciudad de la Habana, 335 F.2d 619, 626 (4th Cir.1964) ("A distinction has been drawn between jurisdictional immunity and immunity from execution of the property of a sovereign, and waiver of the former is not necessarily a waiver of the latter."); Dexter & Carpenter v. Kunglig Jarnvagsstyrelsen, 43 F.2d 705, 708 (2d Cir.1930) (holding that waiver of jurisdictional immunity does not waive immunity from attachment); Rich v. Naviera Vacuba S.A., 197 F.Supp. 710, 722-23 (E.D.Va.1961) (same). The FSIA narrowed the scope of immunity from attachment,[14] but as we explained above, the structure of the Act makes clear that it preserved the traditional distinction between the two forms of immunity. The scant post-FSIA authority that speaks on the subject suggests that the statute did not change the earlier rule that waiver of jurisdictional immunity does not constitute a waiver of immunity from attachment. See Restatement (Third) of Foreign Relations Law of the United States § 456(1)(b) (noting that under inter national law, "a waiver of immunity from suit does not imply a waiver of immunity from attachment of property, and a waiver of immunity from attachment of property does not imply a waiver of immunity from suit."); DeLetelier v. Republic of Chile, 748 F.2d 790, 798-99 (2d Cir.1984) (noting that, in enacting FSIA, Congress did not intend "to reverse completely the historical and international antipathy to executing against a foreign state's property even in cases where a judgment could be had on the merits"). For these reasons, and because we construe the waiver provisions in FSIA narrowly, see Joseph v. Office of the Consulate Gen. of Nigeria, 830 F.2d 1018, 1022 (9th Cir.1987), we conclude that MOD's waiver of jurisdictional immunity did not also constitute a waiver of its immunity from having its property attached.
 
 
 41
 B. Attachment Under § 1610(b)(2) of the FSIA
 
 
 42
 Even though we reject the district court's finding that MOD had waived its sovereign immunity from attachment, we nonetheless affirm its determination that the Cubic judgment is subject to attachment by Elahi because we conclude that the judgment is subject to the exception in § 1610(b)(2) of the FSIA.[15] The relevant part of that section provides that
 
 
 43
 [A]ny property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if —
 
 
 44
 ...
 
 
 45
 the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a)(2), (3), (5), or (7), or 1605(b) of this chapter, regardless of whether the property is or was involved in the act upon which the claim is based.
 
 
 46
 28 U.S.C. § 1610(b)(2). This provision will apply to the Cubic judgment if: 1) MOD is engaged in commercial activity in the United States; and 2) Elahi's claim is one for which MOD is not immune by virtue of 28 U.S.C. § 1605(a)(7).
 
 
 47
 MOD was "engaged in commercial activity" within the meaning of 28 U.S.C. § 1610(b). The phrase "commercial activity" is defined by FSIA as meaning "either a regular course of commercial conduct or a particular cmercial transaction or act." 28 U.S.C. § 1603(d). The statutory definition further makes clear that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." Id.; see also Saudi Arabia v. Nelson, 507 U.S. 349, 356, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). MOD's dispute with Cubic arose out of a contract between MOD's predecessor and Cubic for the purchase of military equipment. We have twice recognized that "a contract to purchase military supplies, although clearly undertaken for public use, is commercial in nature...." Joseph v. Office of the Consulate Gen. of Nigeria, 830 F.2d 1018, 1023 (9th Cir.1987); see also Park v. Shin, 313 F.3d 1138, 1145 (9th Cir.2002) (quoting Joseph). Although perhaps not technically bound by these statements, we find them persuasive because they are consistent with the legislative history of the FSIA, see FSIA House Report at 16 ("[A] contract by a foreign government to buy provisions or equipment for its armed forces... constitutes a commercial activity."), and with the holdings of other courts which have considered the question. See McDonnell Douglas Corp. v. Islamic Republic of Iran, 758 F.2d 341, 349 (8th Cir.1985) (holding that "the intent of the purchasing sovereign to use the goods for military purposes does not take the transaction outside of the `commercial' exception to sovereign immunity"); Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova, 133 F.Supp.2d 1, 7-8 (D.D.C.1999) (holding that contract for sale of MiG-29 fighters was commercial activity for purposes of FSIA). We therefore hold that MOD is engaged in commercial activity in the United States within the meaning of the FSIA because of its contractual relationship with Cubic.
 
 
 48
 We also conclude that Elahi's claim is one for which MOD is not immune by virtue of 28 U.S.C. § 1605(a)(7). 28 U.S.C. § 1605(a)(7) explains that "a foreign state shall not be immune from the jurisdiction of the courts of the United States" in cases involving state-sponsored terrorist activity. The term "foreign state" in 28 U.S.C. § 1605(a)(7) is defined in 28 U.S.C. § 1603(a), which states that a "foreign state" as used in the statute "includes a political subdivision of a foreign state or an agency or instrumentality." Thus, under § 1605(a)(7), once a foreign state has engaged in state- sponsored terrorist activity, all of its agencies and instrumentalities are likewise not immune from jurisdiction.
 
 
 49
 In this case, Elahi seeks to attach MOD's property to enforce a judgment brought under § 1605(a)(7) against Iran, and under § 1603(a), Iran was a "foreign state" that included all of the "agencies and instrumentalities" of Iran. One of those agencies was MOD. Thus, the underlying removal of Iran's sovereign immunity under § 1605(a)(7) also removed the sovereign immunity of MOD, and for the purpose of determining whether MOD lacks immunity from attachment under § 1610(b)(2), the underlying D.C. Circuit judgment was one for which MOD was "not immune by virtue of" § 1605(a)(7).[16]
 
 
 50
 Although § 1610(a) also discusses foreign state immunity from attachment, this reading of § 1610(b)(2) is consistent with the structure of § 1610 as a whole. In § 1610(a), Congress denied sovereign immunity from attachment to a foreign state's property "used for a commercial activity" in the United States. In § 1610(b)(2), Congress denied attachment immunity for property of foreign state agencies "engaged in commercial activity." In both instances, the underlying purpose was to deny sovereign immunity from attachment to satisfy judgments against foreign states in circumstances where the foreign government is engaging in commercial activity in the United States — either directly, through the use of particular property, or indirectly, through the commercial activities of an agency or instrumentality.
 
 
 51
 While we hold that a foreign state agency is not immune from attachment of its property to satisfy a judgment against a foreign state so long as the conditions of § 1610(b)(2) are met, we do not hold that the property of any foreign state agency or instrumentality can be used to satisfy any judgment against a foreign state. Rather, once it has been established that a foreign state agency or instrumentality has no immunity from attachment of its property under § 1610(b)(2), it is then necessary also to determine whether the agency or instrumentality is liable so that its property may be attached. We explained that attachment immunity and attachment liability are distinct issues in Flatow v. Islamic Republic of Iran, 308 F.3d 1065, 1069 (9th Cir.2003). While "[t]he enumerated exceptions to the FSIA provide the exclusive source of subject-matter jurisdiction over civil actions brought against foreign states,... the FSIA does not resolve questions of [attachment] liability. Questions of liability are addressed by Bancec,[17] which examines the circumstances under which a foreign entity can be held substantively liable for the foreign government's judgment debt." Id. (internal citation omitted).
 
 
 52
 In Bancec, the Supreme Court held that foreign agencies and instrumentalities, even those wholly owned by a foreign government, are subject to a presumption of separate judicial status. 462 U.S. at 626-27, 103 S.Ct. 2591. Thus, in the ordinary course of business, a foreign instrumentality will not have its property subject to attachment to satisfy a judgment against a foreign state, regardless of § 1610(b)(2). The Court noted, however, that there are a number of situations in which that presumption of separate status can be overcome. Id. at 627-28, 103 S.Ct. 2591. Most significantly for our purposes here, the presumption of separate status can be overcome when it can be shown that the "corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created." Id. at 629, 103 S.Ct. 2591. In Walter Fuller Aircraft Sales Inc. v. Republic of the Philippines, 965 F.2d 1375, 1380 n. 7 (5th Cir.1992), for example, the Fifth Circuit discussed five "Bancec" factors to determine when the presumption of separate judicial status should be overcome in determining attachment liability. See id. (describing "(1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations"); see also Flatow I, 308 F.3d at 1071 n. 9 (discussing Walter Fuller). Here, an analysis of MOD's relationship to Iran with respect to each of these factors makes clear that the Bancec presumption of separate judicial status is overcome; MOD is a central organ of the Iranian government under direct control of the government. As a result, MOD not only lacks immunity from attachment but is also liable for attachment of its property to enforce the underlying judgment against Iran.
 
 
 53
 In sum, to determine whether the property of a foreign state agency or instrumentality can be attached to enforce a judgment against a foreign state, we apply a two-step analysis. First, we look at whether the judgment is one for which the agency is not immune from attachment under FSIA; and second, if so, we determine whether the foreign agency or instrumentality should be held liable for attachment under Bancec. Applying this two-step analysis to this case, we find that a) MOD's Cubic judgment falls under the exception to foreign sovereign immunity from attachment set out in 28 U.S.C. § 1610(b)(2); and b) MOD is liable for attachment of its property to enforce a judgment against Iran under Bancec.
 
 
 54
 C. Exemptions from Attachment Under § 1611 of FSIA
 
 
 55
 MOD argues that, even if the Cubic judgment is subject to attachment under § 1610 of FSIA, Elahi is still precluded from attaching the judgment because it falls under one of the exemptions from attachment set out in 28 U.S.C. § 1611(b). We examine each of the arguments advanced by MOD in turn.
 
 
 56
 
 1. The Cubic Judgment as Military Property Under § 1611(b)(2) of the FSIA
 
 
 
 57
 MOD argues that the Cubic judgment is exempted from attachment because it is the type of military property described in § 1611(b)(2) of the FSIA. That section provides that
 
 
 58
 Notwithstanding the provisions of section 1610 of [the FSIA], the property of a foreign state shall be immune from attachment and from execution, if
 
 
 59
 ...
 
 
 60
 the property is, or is intended to be, used in connection with a military activity and
 
 
 61
 (A) is of a military character, or
 
 
 62
 (B) is under the control of a military authority or defense agency.
 
 
 63
 28 U.S.C. § 1611(b)(2). MOD appears to concede that the Cubic judgment is not property of a military character under subparagraph (A),[18] instead stressing that the judgment falls under subparagraph (B) as property under the control of a military authority or defense agency. Our inquiry focuses on whether the Cubic judgment is property that is, or is intended to be, used in connection with a military activity.
 
 
 64
 We agree with the district court's conclusion that the Cubic judgment is not exempt from attachment under 28 U.S.C. § 1611(b)(2). See District Court Order at 1149. The plain language of § 1611(b)(2) requires MOD to establish that there is some present or future intended use for the property that is connected to military activity. In addition, the FSIA's legislative history emphasizes that "property will be immune only if its present or future use is military (e.g., surplus military equipment withdrawn from military use would not be immune)." FSIA House Report at 31. MOD has made no showing that any proceeds from the Cubic judgment are to be used in any way related to Iran's military activities;[19] in fact, MOD's only statements regarding the future of any monies stemming from the judgment is that they are to revert to Iran's Central Bank. See section III. C. 2., infra. We therefore hold that Elahi is not barred from attaching the Cubic judgment by virtue of the military property exemption set out in 28 U.S.C. § 1611(b)(2).[20]
 
 
 65
 
 2. The Cubic Judgment as Property of a Central Bank under § 1611(b)(1) of the FSIA
 
 
 
 66
 MOD argues that if the Cubic judgment is not to be treated as military property under § 1611(b)(2) of the FSIA, it should then be considered the property of Iran's central bank under § 1611(b)(1). The relevant portion of that section provides that
 
 
 67
 Notwithstanding the provisions of section 1610 of [the FSIA], the property of a foreign state shall be immune from attachment and from execution, if
 
 
 68
 ...
 
 
 69
 the property is that of a foreign central bank or monetary authority held for its own account....
 
 
 70
 28 U.S.C. § 1611(b)(1). During the district court proceedings, MOD introduced the declaration of Dr. Assadollah Karimi, an alleged specialist in Iranian banking law, who concluded that "all sums relating to the ministries and governmental institutions [of Iran] do belong to the Bank Markazi [Iran's central bank] and that they have to be settled to the Treasury General's account to be expended in due time according to the budget act." Karimi Declaration ¶ 16. MOD claims that, because any proceeds of the Cubic judgment would revert to Iran's central bank, it falls under the scope of § 1611(b)(1).
 
 
 71
 We agree with the district court's conclusion that the Cubic judgment is not exempted from attachment under § 1611(b)(1) of the FSIA. The plain language of the statute requires that the property at issue not only belong to a foreign state's central bank, but also be "held for [the central bank's] own account...." 28 U.S.C. § 1611(b)(1) (emphasis added). The FSIA's legislative history makes clear that the exemption was meant to apply to
 
 
 72
 funds of a foreign central bank or monetary authority which are deposited in the United States and "held" for the bank's or authority's "own account" — i.e., funds used or held in connection with central banking activities, as distinguished from funds used solely to finance the commercial transactions of other entities or of foreign states.
 
 
 73
 FSIA House Report at 31. Even if the statements in Dr. Karimi's declaration could be stretched to mean that the Cubic judgment belonged to Iran's central bank, MOD cannot show that the judgment is "used or held in connection with central banking activities."[21] Indeed, MOD's position in this case would mean that virtually any funds belonging to any Iranian agency would be subject to the central bank exemption. We reject such a broad reading of § 1611(b)(1) and hold that the Cubic judgment is not exempted from attachment by that provision.
 
 
 74
 * * *
 
 
 75
 We conclude that the Cubic judgment is not exempted from attachment under either prong of § 1611(b) of the FSIA.
 
 
 76
 D. The Impact of the Iranian Regulations on Elahi's Attachment
 
 
 77
 MOD argues that the Iranian regulations issued pursuant to the IEEPA, 31 C.F.R. pts. 535 and 560, prohibit attachment of the Cubic judgment by Elahi. Elahi points out, correctly, that MOD did not raise this issue before the district court. Although we could decline to reach the issue for that reason, we exercise our discretion to consider the merits of MOD's arguments. See Abramson v. Brownstein, 897 F.2d 389, 391 (9th Cir.1990) ("We may consider an argument not raised in the district court ... if it is an issue of law not dependent on a factual record developed by the parties.").
 
 
 78
 As we explained in section II, supra, the Cubic judgment is property regulated by the United States through the IACR, 31 C.F.R. pt. 535. In particular, 31 C.F.R. § 535.201 provides that "[n]o property subject to the jurisdiction of the United States ... in which on or after [November 14, 1979] Iran has any interest of any nature whatsoever may be transferred, paid, exported, withdrawn or otherwise dealt in except as authorized." If this were all that the regulations provided, MOD would likely be correct that the regulations would prevent Elahi from attaching the Cubic judgment. However, the regulations also provide for general licenses which authorize broad classes of transactions — transactions that would otherwise be prohibited by § 535.201. See 31 C.F.R. §§ 535.504-535.580. One of these general licenses provides that "[t]ransactions involving property in which Iran or an Iranian entity has an interest are authorized where ... [t]he interest in the property of Iran or an Iranian entity ... arises after January 19, 1981." 31 C.F.R. § 535.579(a)(2). MOD's interest in the Cubic judgment "arose" on December 7, 1998, when the district court confirmed the ICC award against Cubic. MOD v. Cubic Def. Systems, Inc., 29 F.Supp.2d 1168 (S.D.Cal.1998). Therefore, because any transactions involving the Cubic judgment are authorized under 31 C.F.R. § 535.579, Elahi is not barred from attaching the judgment by the IACR.[22]
 
 
 79
 E. MOD's Collateral Attacks on Elahi's Default Judgment
 
 
 80
 In its reply brief and in supplemental filings, MOD has raised new arguments attacking the original default judgment that Elahi is seeking to enforce. MOD contends that we can consider these late-raised arguments because they challenge the subject-matter jurisdiction of the District Court for the District of Columbia when it issued the default judgment. We address briefly MOD's contentions.
 
 
 81
 The Supreme Court has explained that "[a] defendant is always free to ignore [a] judicial proceeding, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding." Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 706, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); see also Practical Concepts, Inc. v. Republic of Bolivia, 811 F.2d 1543, 1547 (D.C.Cir.1987). It is therefore clear that MOD could have mounted a collateral attack on the Elahi default judgment in the proceedings below on the ground that the D.C. district court lacked either personal or subject-matter jurisdiction. MOD did not mount such a challenge below, however, nor did it do so in its opening brief before this court. Because personal jurisdiction — unlike subject-matter jurisdiction — is waivable, see Ins. Corp. of Ireland, 456 U.S. at 703, 102 S.Ct. 2099 ("Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived."), MOD has waived any collateral challenges to the default judgment based on the issuing court's lack of personal jurisdiction. See Am. Ass'n of Naturopathic Physicians v. Hayhurst, 227 F.3d 1104, 1107 (9th Cir.2000) ("[A]lthough [Hayhurst] certainly did have the right to object to personal jurisdiction after the default judgment was entered against him, he then squandered that opportunity by failing to raise it.").
 
 
 82
 The analysis is different regarding collateral attacks challenging the issuing court's subject-matter jurisdiction because that type of jurisdiction "can never be forfeited or waived." United States v. Cotton, 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002).[23] We conclude, however, that none of the claims that MOD has raised to attack the default judgment issued by the D.C. district court actually challenge that court's subject-matter jurisdiction — that is, its power to hear the case. See id. MOD's arguments regarding the constitutionality of the statutes underlying the default judgment are challenges to the merits of the decision, not to the court's jurisdiction. 28 U.S.C. § 1330(a) provides that district courts shall have original jurisdiction of any non-jury civil action against any foreign state or its agency or instrumentality, so long as such action falls under one of the exceptions to foreign sovereign immunity. As we have explained, see section III. B., supra, Elahi's action fell under the state-sponsored terrorism exception to sovereign immunity set out in 28 U.S.C. § 1605(a)(7). The District Court for the District of Columbia therefore had subject-matter jurisdiction over Elahi's claim.
 
 
 83
 MOD relies heavily on a recent decision by the Court of Appeals for the District of Columbia, Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024 (D.C.Cir.2004). In Cicippio, the D.C. Circuit held that "neither 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private right of action against a foreign government." Id. at 1033. MOD argues that, because the D.C. Circuit's holding in Cicippio makes clear that the D.C. district court erred in issuing the default judgment, that judgment is void ab initio and should not be enforced. As we have explained, however, "[a] judgment is not void merely because it is erroneous." United States v. Holtzman, 762 F.2d 720, 724 (9th Cir.1985) (quoting 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2862 at 198 (1973)). A judgment is void only if the issuing court lacked subject-matter jurisdiction over the action or if the judgment was otherwise entered in violation of due process. Tomlin v. McDaniel, 865 F.2d 209, 210 (9th Cir.1989). As we explained above, the district court for the District of Columbia did have subject-matter jurisdiction over Elahi's action. In fact, the D.C. Circuit in Cicippio recognized that Congress had conferred subject-matter jurisdiction over the type of action Elahi brought against Iran, even as it concluded that Congress had not created a cause of action upon which a plaintiff like Elahi could proceed. See Cicippio, 353 F.3d at 1034 ("[28 U.S.C. § 1605(a)(7)] confers subject-matter jurisdiction on federal courts over [lawsuits for damages for certain enumerated acts of terrorism], but does not create a private right of action."). MOD has also not shown that the district court that issued the default judgment in favor of Elahi acted in a manner inconsistent with due process. Cf. In re Center Wholesale, Inc., 759 F.2d 1440, 1448 (9th Cir.1985) (holding judgment void because aggrieved party had not received adequate notice of the proceedings).
 
 
 84
 For these reasons, we reject MOD's collateral challenges to Elahi's default judgment.
 
 CONCLUSION
 
 85
 We affirm the district court's denial of Flatow's motion for leave to intervene, as well as its determination that Flatow has relinquished any claim to attaching the Cubic judgment by accepting payments pursuant to the Victims Protection Act. We also affirm the district court's decision that the Cubic judgment is subject to attachment by Elahi and reject MOD's collateral attacks on Elahi's default judgment.
 
 
 86
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Flatow sued under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1241 (1996), and a separate provision known as the "Flatow Amendment," 1997 Omnibus Consolidated Appropriations Act, Pub.L. 104-208, Div. A, Title I § 101(c), 110 Stat. 3009-172,reprinted at 28 U.S.C.A. § 1605 note (West 2003). These provisions purported to provide both a cause of action and a forum to adjudicate claims arising from state-sponsored terrorist attacks which resulted in the death or injury of a United States citizen. See generally Flatow, 999 F.Supp. at 12-13. AEDPA also created an exception to the sovereign immunity of foreign states designated as terrorist states in cases in which the foreign state commits a terrorist act or provides support to others who commit such an act. See id.; 28 U.S.C. § 1605(a)(7).
 
 
 [2]
 Under 28 U.S.C. § 1608(e), the district court cannot enter a default judgment against a foreign state until the claimant "establishes his claim or right to relief by evidence satisfactory to the court."
 
 
 [3]
 "The New York Convention" refers to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitration Awards,opened for signature June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3, reprinted in 9 U.S.C.A. § 201 note (West 2003).
 
 
 [4]
 Throughout this opinion, we will refer to this $2.8 million judgment entered against Cubic and on behalf of MOD as the "Cubic judgment."
 
 
 [5]
 Because we affirm the district court's decision on this ground, we need not consider whether Flatow's motion to intervene was timely, and we decline to do so
 
 
 [6]
 The full language of the relevant portion of section 203 is as follows:
 At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise —
 (A) investigate, regulate, or prohibit —
 (i) any transactions in foreign exchange,
 (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
 (iii) the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States;
 (B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.
 50 U.S.C. § 1702(a)(1)(A) and (B).
 
 
 [7]
 Since 1979, the President has issued several declarations continuing the state of emergency with respect to IranSee, e.g., Continuation of Iran Emergency, 66 Fed.Reg. 56,966 (Nov. 8, 2001); Continuation of Iran Emergency, 62 Fed.Reg. 51,591 (Sept. 30, 1997); Continuation of Iran Emergency, 55 Fed.Reg. 47,453 (Nov. 9, 1990).
 
 
 [8]
 Both regulatory schemes are administered by the Office of Foreign Assets Control (OFAC), an entity within the Department of the Treasury
 
 
 [9]
 The New York Convention remains relevant, however, to the original dispute between MOD and Cubic, which is still on appeal
 
 
 [10]
 31 C.F.R. § 501.601 provides:
 Except as otherwise provided, every person engaging in any transaction subject to the provisions of this chapter [which includes both the IACR and ITR] shall keep a full and accurate record of each such transaction engaged in, regardless of whether such transaction is effected pursuant to license or otherwise, and such record shall be available for examination for at least 5 years after the date of such transaction.
 (emphasis added).
 
 
 [11]
 As we explain more fully below, the notice issued by OFAC to implement the payment scheme set up by the Victims Protection Act warned that "virtually all Iranian ... property within the jurisdiction of the United States is `property with respect to which financial transactions are prohibited or regulated pursuant to' IEEPA...." 65 Fed.Reg. 70,382, 70,384 (Nov. 22, 2000)
 
 
 [12]
 For instance, Flatow may be able to collect the remainder of his judgment against Iranian property not subject to the jurisdiction of the United States
 
 
 [13]
 Elahi appears to concede that MOD is an agency and instrumentality of Iran and is therefore subject to the provisions of the FSIASee 28 U.S.C. § 1603(b) (defining an "agency or instrumentality" of a foreign state). Under 28 U.S.C. § 1603(a), MOD also qualifies as a "foreign state" for purposes of the FSIA.
 
 
 [14]
 Prior to the FSIA, foreign states and their instrumentalities enjoyed virtually absolute immunity from having their property attached or executed uponSee Conn. Bank of Commerce, 309 F.3d at 251-52. The legislative history of the FSIA makes clear that its drafters intended to "modify this rule by partially lowering the barrier of immunity from execution, so as to make this immunity conform more closely with the provisions on jurisdictional immunity" in FSIA. H.R. Rep. 94-1487, at 27 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6626 (hereinafter "FSIA House Report").
 
 
 [15]
 We may affirm the district court on any ground supported by the recordCity Solutions, Inc. v. Clear Channel Communications, 365 F.3d 835, 842 (9th Cir.2004) (quoting Dixon v. Wallowa County, 336 F.3d 1013, 1018 (9th Cir.2003)).
 
 
 [16]
 Because we conclude that the Cubic judgment is subject to attachment under 28 U.S.C. § 1610(b)(2), we do not consider whether the judgment may be subject to attachment under any other exception to immunity from attachment in the FSIA that might apply
 
 
 [17]
 The full citation ofBancec is First National City Bank v. Banco Para El Comercio Exterior De Cuba, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) but is commonly known as the "Bancec" case.
 
 
 [18]
 The FSIA's legislative history makes clear that the Cubic judgment is not property of a military character for purposes of this provisionSee FSIA House Report at 31 ("[P]roperty is of a military character if it consists of equipment in the broad sense-such as weapons, ammunition, military transport, warships, tanks, communications equipment.").
 
 
 [19]
 We note, however, that even if MOD had argued that the proceeds from the Cubic judgment were destined to fund military activities, such an indirect relation between the property at issue and military activities may not be sufficient to make the exemption applicable
 
 
 [20]
 MOD argues that our reading of the statute would run counter to the congressional purpose behind the military property exemption, which was to encourage purchases of military equipment in the United States. While we agree that Congress intended to provide some protection to purchases of military equipment by foreign governments, we reject MOD's contention that Congress meant this protection to be absolute
 
 
 [21]
 The district courts that have considered the central bank exemption so far have read it narrowly; in some cases, the exemption has been found not to apply even where the funds unquestionably belonged to the foreign state's central bankSee Banco Central de Reserva del Peru v. Riggs Nat'l Bank of Washington, D.C., 919 F.Supp. 13, 17 (D.D.C.1994) (holding that central bank exemption did not apply to an account of Peru's central bank because the funds were being used to guarantee loans to commercial banks and not as part of central banking activities); Weston Compagnie de Finance et D'Investissement, S.A. v. Republica del Ecuador, 823 F.Supp. 1106, 1114 (S.D.N.Y.1993) (holding that some of the funds belonging to Ecuador's central bank were not exempted from attachment because they were used for commercial banking purposes).
 
 
 [22]
 The Iranian Transactions Regulations, 31 C.F.R. pt. 560, impose separate restrictions on the ability to transfer funds from a United States entity to an Iranian entitySee 31 C.F.R. § 560.216. However, these regulations would not come into play where Elahi successfully attaches the judgment against Cubic, since the funds would then be transferred from Cubic to Elahi, thereby bypassing any Iranian entities.
 
 
 [23]
 We do not hold that the non-waivability of subject-matter jurisdiction means that a party can wait as long as MOD has to raise its collateral attack. However, because MOD's claims fail on the merits, we will assume for purposes of this case that subject-matter jurisdiction is an issue that can be raised at any point, even in proceedings mounting a collateral attack on a default judgment