(Slip Opinion)     OCTOBER TERM, 2008     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MINISTRY OF DEFENSE AND SUPPORT FOR THE ARMED FORCES OF THE ISLAMIC REPUBLIC OF IRAN *v.* ELAHI

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 07–615.   Argued January 12, 2009—Decided April 21, 2009

In 1997, the International Court of Arbitration awarded petitioner Iranian Ministry of Defense (hereinafter Iran) $2.8 million to settle a dispute with Cubic Defense Systems, Inc., a California company, over a 1977 contract that would have provided Iran with an air combat training system.   When Cubic refused to pay, Iran sued in the Federal District Court in San Diego, which ordered Cubic to pay the award plus interest (Cubic Judgment).   In 2000, respondent Elahi sued Iran in the D.C. Federal District Court, claiming that Iranian agents had murdered his brother.   He obtained a default judgment of about $312 million and sought to collect some of the money by attaching the Cubic Judgment.   Iran opposed the lien under the Foreign Sovereign Immunities Act of 1976 (FSIA).   The California District Court denied Iran's immunity claim, and the Ninth Circuit affirmed, finding an exception to sovereign immunity.   This Court vacated and remanded.   *Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran* v. *Elahi*, 546 U. S. 450.

On remand, the Ninth Circuit found that a different immunity exception applied, citing the Terrorism Risk Insurance Act of 2002 (TRIA), which permitted holders of terrorism-related judgments against Iran to attach "blocked" Iranian assets.   The United States had blocked Iranian assets following the Iranian hostage crisis in 1979, and the court held that the asset Elahi sought to attach had remained blocked notwithstanding the unblocking orders issued after the crisis was resolved by the Algiers Accords in 1981.   The court reasoned that those unblocking orders had omitted military goods such as the training system underlying the Cubic Judgment.   The court

further rejected Iran's argument that Elahi had waived his right of attachment, and concluded that he could attach the Cubic Judgment.

*Held*:

1. The asset in question was not "blocked" at the time of the Ninth Circuit's decision. Contrary to that court's holding, the relevant asset is not Iran's interest in the air combat training system, but, rather, a judgment enforcing an arbitration award based upon Cubic's failure to account to Iran for its share of the proceeds of the system's eventual sale to Canada. And neither the Cubic Judgment nor the sale proceeds it represents were blocked assets at the time of the Court of Appeals' 2007 decision. In a 1981 order, the Treasury Department unblocked transactions involving property in which Iran's interest arose after January 19, 1981. Iran's interest in the Cubic Judgment itself arose on December 7, 1998, when the District Court confirmed the arbitration award. And Iran's interest in the property underlying the judgment arose, as the arbitrators ruled, when Cubic completed its sale of the air combat system in October 1982. Thus, whether Iran's "interest in property" is considered to be its interest in the Cubic Judgment itself or its underlying interest in the sale proceeds, the interest falls within the terms of the Treasury Department's general unblocking order. Even assuming (as the Ninth Circuit held) that the relevant asset was Iran's pre-1981 interest in the training system itself, that asset still was not "blocked" at the time of the decision below. Such an interest would fall directly within the scope of Executive Order No. 12281, which required that property owned by Iran be transferred "as directed . . . by the Government of Iran." No authority supports the contrary conclusion. Pp. 8–11.

2. Elahi cannot attach the Cubic Judgment because he has waived his right to do so. Section 2002 of the Victims of Trafficking and Violence Protection Act of 2000 (VPA) offers compensation to individuals holding terrorism-related judgments against Iran. It requires those receiving payment to relinquish "all rights to . . . attach property that is at issue in claims against the United States before an international tribunal." §2002(a)(2)(D). In 2003, the U. S. Government paid Elahi $2.3 million under the VPA as partial compensation for his judgment against Iran, and he signed a waiver form that mirrors the statutory language. A review of the record in Iran-U. S. Claims Tribunal Case No. B61 demonstrates that the Cubic Judgment falls within the terms of Elahi's waiver. Iran filed that case in 1982, claiming that between 1979 and 1981 the United States had wrongly barred the transfer of the Cubic training system and other military equipment to Iran. Iran asked the Tribunal to order the United States, among other things, to pay Iran damages. The United States answered that the Tribunal should set off the $2.8 million represented by the Cubic

Syllabus

Judgment against any award. Iran argued that the Tribunal should not set off the $2.8 million insofar as third parties have attached the judgment. In the terms of Elahi's waiver, therefore, the Cubic Judgment is "property," and Case No. B61 itself is a "clai[m] against the United States before an international tribunal." And there remains a significant dispute about whether the Cubic Judgment can be used by the Tribunal as a setoff, placing the Judgment "at issue" in Case No. B61. Elahi's arguments to the contrary are unavailing. Pp. 12–20.

    3. Given Elahi's waiver, this Court need not decide whether the Cubic Judgment was blocked by new Executive Branch actions following the Ninth Circuit's decision. P. 20.

495 F. 3d 1024, reversed.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, SCALIA, THOMAS, and ALITO, JJ., joined, and in which KENNEDY, SOUTER, and GINSBURG, JJ., joined as to Parts I and II. KENNEDY, J., filed an opinion concurring in part and dissenting in part, in which SOUTER and GINSBURG, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–615

MINISTRY OF DEFENSE AND SUPPORT FOR THE ARMED FORCES OF THE ISLAMIC REPUBLIC OF IRAN, PETITIONER *v.* DARIUSH ELAHI

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[April 21, 2009]

JUSTICE BREYER delivered the opinion of the Court.

Dariush Elahi, the respondent, sued Iran, claiming that Iran unlawfully participated in the assassination of his brother, and he obtained a default judgment of about $312 million. Seeking to collect some of the money, he has tried to attach an asset belonging to Iran, namely a $2.8 million judgment that Iran obtained against a California company called Cubic Defense Systems, Inc. (Cubic Judgment). Iran has asserted a defense of sovereign immunity in order to prevent the attachment. See Foreign Sovereign Immunities Act of 1976, 28 U. S. C. §1610.

Since Iran is a sovereign nation, Elahi cannot attach the Cubic Judgment unless he finds an exception to the principle of sovereign immunity that would allow him to do so. See *Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran* v. *Elahi*, 546 U. S. 450 (2006) *(per curiam)*. As the case reaches us, the Terrorism Risk Insurance Act of 2002 (TRIA), §201(a), 116 Stat. 2337, note following 28 U. S. C. §1610, provides the sole possible exception. That Act authorizes holders of terrorism-

related judgments against Iran, such as Elahi, to attach
Iranian assets that the United States has *"blocked." Ibid.*
(emphasis added). And we initially decide whether Iran's
Cubic Judgment is a "blocked asset" within the terms of
that Act.

Even if the Cubic Judgment is a blocked asset, however,
Elahi still cannot attach it if he waived his right to do so.
And we next decide whether Elahi waived that right
when, in return for partial compensation from the Gov-
ernment, he agreed not to attach *"property that is at issue
in claims against the United States before an international
tribunal."* Victims of Trafficking and Violence Protection
Act of 2000 (VPA), §2002(d)(5)(B), as added by TRIA
§201(c)(4), 116 Stat. 2339, note following 28 U. S. C. §1610
(emphasis added).

We ultimately hold that the Cubic Judgment was not a
"blocked asset" at the time the Court of Appeals handed
down its decision in this case. We recognize that since
that time new Executive Branch action may have
"blocked" that asset; but, in light of the posture of the case,
we do not decide whether it has done so. Rather, we de-
termine that Elahi cannot attach the Cubic Judgment
regardless, for the Judgment is "at issue" in a claim
against the United States before the Iran-U. S. Claims
Tribunal. The Judgment consequently falls within the
terms of Elahi's waiver.

I

We initially set forth key background elements, includ-
ing in this section the events necessary to understand the
"blocked asset" question, while leaving for Part III, *infra*,
additional background matters related to Elahi's waiver.

A

The Cubic Judgment arose out of a 1977 contract be-
tween Cubic Defense Systems, a California company and

Iran's Ministry of Defense. (We shall refer to the Ministry, for present purposes an inseparable part of the Iranian State, as "Iran." See *Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran* v. *Cubic Defense Systems, Inc.*, 495 F. 3d 1024, 1035–1036 (CA9 2007)). Cubic there promised to supply Iran with certain military goods, namely an air combat training system, for which Iran promised to pay approximately $18 million dollars. In 1979, after Iran had paid some of the money but before Cubic had sent the training system, the Iranian Revolution broke out, militants in Iran seized American hostages, and President Carter "*blocked* all property and interests in property of the Government of Iran . . . subject to the jurisdiction of the United States." Exec. Order No. 12170, 3 CFR 457 (1979 Comp.) (emphasis added), promulgated pursuant to the authority of International Emergency Economic Powers Act (IEEPA), 50 U. S. C. §§1701–1702 (2000 ed. and Supp. V); 31 CFR §535.201 (1980).

About a year later, on January 19, 1981, Iran and the United States settled the crisis, in part with an agreement called the "Algiers Accords." 20 I. L. M. 224. Under the Accords, the United States agreed to "restore the financial position of Iran, in so far as possible, to that which existed prior to November 14, 1979," *ibid.*, and (with some exceptions) to "arrange, subject to the provisions of U. S. law applicable prior to November 14, 1979, for the transfer to Iran of all Iranian properties," *id.*, at 227. The President then lifted the legal prohibitions against transactions involving Iranian property. See Exec. Orders Nos. 12277–12282, 3 CFR 105–113 (1981 Comp.); 31 CFR §§535.211–535.215 (1981). In doing so, he ordered the transfer to Iran of Iranian financial assets and most other Iranian property "as directed . . . by the Government of Iran," Exec. Order No. 12281, 3 CFR 112 (1981 Comp.). Shortly thereafter, the Treasury Department issued a general license authorizing "[t]ransactions involving property in

which Iran . . . has an interest" where "[t]he property comes within the jurisdiction of the United States . . . after January 19, 1981, or . . . [t]he interest in the property . . . arises after January 19, 1981." 31 CFR §535.579(a).

The Algiers Accords also set up an international arbitration tribunal, the Iran-U. S. Claims Tribunal (or Tribunal), to resolve disputes between the two nations concerning each other's performance under the Algiers Accords. The Tribunal would also resolve disputes concerning contracts and agreements between the two nations that were outstanding on January 19, 1981. 20 I. L. M., at 230–231. The Tribunal's jurisdiction included claims by nationals of one state against the other state, but it did not include claims by one state against nationals of the other state. *Id.*, at 231–232.

### B

In January 1982, Iran filed two Cubic-based claims in the Tribunal. In Case No. B61, Iran claimed that between 1979 and 1981 the United States had wrongly barred the transfer of certain military equipment, including the Cubic air combat training system, to Iran. Iran asked the Tribunal to order the United States either to issue an export license for the equipment or to pay Iran damages. App. to Brief for United States as *Amicus Curiae* 22a, 24a, 31a.

In Case No. B66, Iran claimed that Cubic had breached its contract to deliver the training system partly because the United States had taken actions contrary to the Algiers Accords. Again Iran asked the Tribunal to order either the issuance of an export license for the equipment or the payment of damages. *Id.*, at 1a, 2a, 9a–10a. In April 1987 the Tribunal dismissed this second case (No. B66) on the grounds that the Iran-Cubic contract imposed no obligations on the United States and that the Tribunal lacked jurisdiction to consider a suit by a state (Iran)

against a private party (Cubic). *Ministry of Nat. Defense of Islamic Republic of Iran* v. *United States*, 14 Iran-U. S. Cl. Trib. Rep. 276, 277–278.

Iran, believing that Cubic had breached its contract, then went to arbitration before the arbitration tribunal specified in the Cubic contract, namely the International Court of Arbitration of the International Chamber of Commerce. Iran asked that arbitration tribunal to award it restitution and damages.

In May 1997 the arbitrators issued their decision. The arbitrators found that prior to the Iranian Revolution, prior to the hostage crisis, and prior to the blocking of any Iranian assets, (1) Iran and Cubic had themselves agreed that they would temporarily discontinue (but not terminate) the contract; and (2) Cubic had agreed to try to sell the training system to another buyer and to settle accounts with Iran later. The arbitrators further found that after the crisis (in September 1981) (3) Cubic successfully sold a modified version of the system to Canada. *Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran* v. *Cubic Int'l Sales Corp.*, No. 7365/FMC (Int'l Ct. of Arbitration of Int'l Chamber of Commerce), pp. 32–33, 36–40, 50–51, reprinted in 13 Mealey's Int'l Arbitration Report pp. G–4, G–15 to G–18, G–21 (Oct. 1998) (Arbitration Award). The arbitrators concluded that Cubic had not lived up to this modified agreement. And, after taking account of the advance payments that Iran had made to Cubic, the funds that Cubic had spent, the amount that Canada had paid Cubic, and various other items, they awarded Iran $2.8 million plus interest. *Id.*, ¶C.18.3(a), at G–31.

Cubic refused to pay Iran this money. Iran then sued in the Federal District Court for the Southern District of California to enforce the arbitration award. The District Court confirmed the award and entered a final judgment ordering Cubic to pay $2.8 million plus interest to Iran.

That judgment is the Cubic Judgment. *Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran* v. *Cubic Defense Systems, Inc.*, 29 F. Supp. 2d 1168, 1174 (1998) (final judgment entered Aug. 10, 1999).

C

In February 2000 Elahi brought a tort action against Iran in the Federal District Court for the District of Columbia. Elahi claimed that Iranian agents had murdered his brother. See 28 U. S. C. §1605(a)(7) (2000 ed.) (lifting sovereign immunity of state sponsors of certain kinds of terrorism) (subsequently replaced by National Defense Authorization Act for Fiscal Year 2008, §1083(a)(1), 122 Stat. 338, 28 U. S. C. A. §1605A); Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997, §589, 110 Stat. 3009–172, note following 28 U. S. C. §1605 (providing tort cause of action). Iran did not answer the complaint. The District Court found Iran in default, and it awarded Elahi nearly $12 million in compensatory damages and $300 million in punitive damages. *Elahi* v. *Islamic Republic of Iran*, 124 F. Supp. 2d 97 (DC 2000).

In 2001 Elahi filed a notice of lien against Iran's Cubic Judgment. He thereby sought to satisfy from the Cubic Judgment a portion of what Iran owed him under his own default judgment against Iran. Iran opposed the lien. It argued that the Cubic Judgment, as property of the sovereign state of Iran, was immune from attachment or execution. The District Court denied immunity. *Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran* v. *Cubic Defense Systems, Inc.*, 236 F. Supp. 2d 1140, 1152 (SD Cal. 2002).

The Court of Appeals affirmed the denial. *Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran* v. *Cubic Defense Systems, Inc.*, 385 F. 3d 1206 (CA9 2004). The Court of Appeals thought that the Minis-

try of Defense of Iran had lost its immunity from attachment because of a special statutory exception that permits a creditor to attach the property of an "agency or instrumentality of a foreign state engaged in commercial activity in the United States"—where the creditor seeks the property to satisfy a terrorism-related judgment. 28 U. S. C. §1610(b). See 385 F. 3d, at 1219–1222. But, on review here, we pointed out (in a *per curiam* opinion) that the sovereign immunity exception upon which the Ninth Circuit had relied—the exception for the property of an entity that has "engaged in commercial activity," §1610(b)(2)—applies only to property of an "agency or instrumentality" of a foreign state. It does not apply to property of an entity that itself is an inseparable part of the foreign state. §1610(a). *Elahi*, 546 U. S., at 452–453.

We remanded the case, and on remand, the Ninth Circuit held that the Ministry of Defense fell into the latter category (an inseparable part of the state of Iran), not the former (an "agency or instrumentality" of Iran). 495 F. 3d 1024, 1035–1036 (2007). Hence Elahi could not take advantage of the "engaged in commercial activities" exception. The Court of Appeals also found inapplicable a slightly different exception applicable to "property . . . of a foreign state . . . used for a commercial activity in the United States," 28 U. S. C. §1610(a). 495 F. 3d, at 1036–1037.

Nonetheless the Court of Appeals found yet another exception that it believed denied Iran its sovereign immunity defense. The court pointed out that in 2002 Congress had enacted the TRIA. That Act permitted a person with a terrorism-related judgment to attach an asset of the responsible "terrorist" state to satisfy the judgment, "[n]otwithstanding any other provision of law," provided that the asset was a "blocked asset." §201(a), 116 Stat. 2337. The Court of Appeals noted that the Cubic Judgment arose out of a pre-1981 contract with Iran involving

an air combat training system for Iran, and that President
Carter had blocked virtually all Iranian assets following
the Iranian hostage crisis. See Exec. Order No. 12170, 44
Fed. Reg. 65729 ("block[ing] all property and interests in
property of the Government of Iran . . . subject to the
jurisdiction of the United States"), promulgated pursuant
to the authority of International Emergency Economic
Powers Act, 50 U. S. C. §§1701–1702 (2000 ed. and Supp.
V); 31 CFR §535.201. The Court of Appeals then held that
the President had never unblocked the asset in question.
495 F. 3d, at 1033. In its view, the many unblocking
orders that were issued after the 1981 Algiers Accords,
see, *e.g.*, Exec. Orders Nos. 12277–12282, 3 CFR 105–113;
31 CFR §§535.211–535.215, 535.579(a), did not apply
because those unblocking orders omitted "military goods
such as the [training system that underlay the Cubic
Judgment]." 495 F. 3d, at 1033.

The Court of Appeals also rejected Iran's argument that
Elahi had waived his right to attach the Cubic Judgment
regardless (a matter to which we shall turn in Part III).
And the court concluded that Elahi was free to attach the
Judgment. *Id.*, at 1037.

Iran, with the support of the Department of State, asked
us to grant certiorari. We did so, and we shall consider
both aspects of the Court of Appeals' determination.

## II
### A

We turn first to the question whether the Cubic Judg-
ment was a "blocked asset." The Ninth Circuit held that
the asset in question consisted of Iran's interest in mili-
tary goods, namely an air combat training system, which
it believed the Executive Branch had failed to unblock
after the Iranian hostage crisis ended. None of the parties
here, however, supports the Ninth Circuit's determination.
And neither do we.

The basic reason we cannot accept the Ninth Circuit's rationale is that we do not believe Cubic's air combat training system is the asset here in question. Elahi does not seek to attach that system. Cubic sent the system itself to Canada, where, as far as we know, it remains. Rather, Elahi seeks to attach a judgment enforcing an arbitration award based upon Cubic's failure to account to Iran for Iran's share of the proceeds of that system's sale. And neither the Cubic Judgment nor the sale proceeds that it represents were blocked assets at the time the Court of Appeals issued its decision.

In 1981, the Treasury Department issued an order that authorized "[t]ransactions involving property in which Iran . . . has an interest" where *"[t]he interest in the property . . . arises after January 19, 1981."* 31 CFR §535.579(a)(1) (emphasis added). As the Court of Appeals itself pointed out, Iran's interest in the Cubic Judgment arose "on December 7, 1998, when the district court confirmed the [arbitration] award." 385 F. 3d, at 1224. Since it arose more than 17 years "after January 19, 1981," the Cubic Judgment falls within the terms of Treasury's order. And that fact, in our view, is sufficient to treat the Judgment as unblocked.

Iran's interest in the property that underlies the Cubic Judgment also arose after January 19, 1981. As the International Court of Arbitration held, Cubic and Iran entered into their initial contract before 1981. But they later agreed to discontinue (but not to terminate) the contract. Arbitration Award G–15, G–21. They agreed that Cubic would try to sell the system elsewhere. *Id.*, ¶C.9.15, at G–14. And they further agreed that they would take "final decisions" about who owed what to whom "only . . . once the result of Cubic's attempt to resell the System" was "known." *Id.*, ¶B.10.7, at G–17.

Cubic completed its sale of the system (to Canada) in October 1982. *Id.*, ¶B.12.14, at G–22. And the arbitrators

referred to October 1982 as "the date the Parties had in mind when they agreed to await the outcome of Cubic's resale attempts." *Ibid.* Only then was Cubic "in a position to reasonably, comprehensively and precisely account for the reuse of components originally manufactured for Iran and for any modification costs." *Ibid.* For those reasons, and in light of the arbitrators' findings, we must conclude that October 1982 is the time when Iran's claim to proceeds arose.

The upshot is that, whether we consider Iran's "interest in property" as its interest in the Cubic Judgment itself or its underlying interest in the proceeds of the Canadian sale, the interest falls within the terms of the Treasury Department's general license authorizing "[t]ransactions involving property in which Iran . . . has an interest" where "[t]he interest in the property . . . arises after January 19, 1981." 31 CFR §535.579(a). And, as we said, that fact is sufficient for present purposes to treat the asset as having been unblocked at the time the Ninth Circuit issued the decision below.

Finally, even if we were to assume (as the Ninth Circuit held) that the relevant asset were Iran's pre-1981 interest in the air combat training system itself, we should still conclude that that asset was not "blocked" at the time of the decision below. As the Government points out, such an interest falls directly within the scope of Executive Order No. 12281, an unblocking order that required property owned by Iran to be transferred "as directed . . . by the Government of Iran." See also 31 CFR §535.215(a). None of the four authorities upon which the Ninth Circuit relied indicates the contrary conclusion. First, the Circuit cited the Arms Export Control Act, 82 Stat. 1321, 22 U. S. C. §2751 *et seq.*, and its implementing regulations, a statute and regulations which regulate arms shipments. It is true that, notwithstanding Executive Order No. 12281, the export of certain military equipment remained

subject to regulation under other statutes, including the Arms Export Control Act. See 31 CFR §535.215(c). But that fact does not show that military equipment remained *blocked* under IEEPA. The Court of Appeals next cited the 1979 Executive Order freezing Iranian assets, Exec. Order No. 12170, 3 CFR 457 (Comp. 1980)—but it failed to consider the effect of the subsequent unblocking order just discussed. The Court of Appeals also relied on a 2005 Presidential notice extending the national emergency with respect to Iran, 70 Fed. Reg. 69039, but that notice did not impose any additional restrictions on Iranian assets. Finally, the Court of Appeals pointed to a Treasury Department guidance document, which states that "[c]ertain assets"—consisting "mainly of military and dual-use property"— "related to . . . claims" by "U. S. nationals . . . against Iran or Iranian entities" still being litigated in the Tribunal "remain blocked in the United States." Office of Foreign Assets Control, Dept. of Treasury, Foreign Assets Control Regulations for Exporters and Importers 23 (2007). But the training system does not fall into the category of assets identified by the guidance document. The system neither "remain[s] . . . in the United States" (having been sent to Canada), nor was it related to claims by "*U. S. nationals . . . against Iran or Iranian entities*" before the Tribunal. In sum, no authority supports the Ninth Circuit's conclusion that an Iranian interest in the training system itself would be a "blocked asset." And none of the parties defend the Ninth Circuit's conclusion here.

B

Although the Cubic Judgment was not a blocked asset at the time the Court of Appeals reached its decision, the Government believes that it is a blocked asset now. In 2005 the President issued a new Executive Order that blocks assets held by proliferators of weapons of mass

destruction.   Exec. Order No. 13382, 3 CFR 170 (2005 Comp.).  And in 2007, after the Court of Appeals issued its decision, the State Department designated certain component parts of Iran's Ministry of Defense as entities whose property and interests in property are blocked under Executive Order No. 13382.  See 72 Fed. Reg. 71991–71992.  If the Iranian entity to which the Cubic Judgment belongs falls within the terms of the State Department's designation, then presumably that asset is blocked at this time.

The problem for the Government, however, is that Iran does not agree that the relevant parts of its Ministry of Defense fall within the scope of the State Department's designation.  Thus the matter is in dispute.  The lower courts have not considered that dispute.  The relevant arguments have not been set forth in detail here.  And in such circumstances we normally would remand the case, permitting the lower courts to decide the issue in the first instance.  See, *e.g.*, *F. Hoffmann–La Roche Ltd* v. *Empagran S. A.*, 542 U. S. 155, 175 (2004).  Consequently, we shall not decide whether the new Executive Branch actions have blocked the Cubic Judgment.  Instead, we turn to the "waiver" question.  And our answer (that Elahi has waived his right to attach the Cubic Judgment) makes it unnecessary to remand the blocking question for further consideration.

## III

As we have just said, the second question concerns Elahi's waiver of his right to attach the Cubic Judgment. In 2000, Congress enacted a statute that offers some compensation to certain individuals, including Elahi, who hold terrorism-related judgments against Iran.  VPA §2002, as amended by TRIA §201(c).  The Act requires those who receive that compensation to relinquish "*all rights to execute against or attach property that is at issue*

*in claims against the United States before an international tribunal,* [or] that is the subject of awards rendered by such tribunal." §2002(a)(2)(D), 114 Stat. 1542; see also §2002(d)(5)(B), as added by TRIA §201(c)(4) (cross-referencing §2002(a)(2)(D)). In 2003 the Government paid Elahi $2.3 million under the Act as partial compensation for his judgment against Iran. Brief for Respondent 9. And at that time, Elahi signed a waiver form that mirrors the statutory language. App. to Pet. for Cert. 30 (citing 68 Fed. Reg. 8077, 8081 (2003)).

The question is whether the Cubic Judgment "is at issue in claims" against the United States before an "international tribunal," namely the Iran-U. S. Claims Tribunal. If so, the Cubic Judgment falls within the terms of Elahi's waiver. The Court of Appeals believed the Judgment was not "at issue." 495 F. 3d, at 1030–1031. But we find to the contrary.

A review of the record in Iran-U. S. Claims Tribunal Case No. B61 leads us to conclude that the Cubic Judgment is "at issue" before that Tribunal. In Case No. B61 Iran argued that, between 1979 and 1981, the United States had wrongly prevented the transfer of Cubic's air combat training system to Iran. Iran asked the Tribunal, among other things, to order the United States to pay damages. Statement of Claim, *Islamic Republic of Iran* v. *United States* (filed Jan. 19, 1982), App. to Brief for United States as *Amicus Curiae* 22a, 24a, 31a. In its briefing before the Tribunal, Iran acknowledged that any amount it recovered from Cubic would "be recuperated from the remedy sought" against the United States. App. 76, n. 2. And Iran sent a letter to the United States in which it said that any amounts it actually received from Cubic would be "recouped from the remedy sought against the United States in Case B61." App. to Brief for United States as *Amicus Curiae* 84a. *But* Iran added that the Cubic Judgment could *not* be used as a setoff *insofar as it had been*

*attached by creditors. Id.*, at 85a.

Meanwhile, in a rebuttal brief before the Tribunal, the United States, while arguing that in fact it owed Iran nothing, added that at the very least Iran must set off the amount "already . . . awarded" by the International Court of Arbitration (namely, the $2.8 million awarded to Iran from Cubic) against any money awarded by the Tribunal. *Id.*, at 52a, 80a–81a, and n. 32.  And the United States' demand for a setoff applies even if third parties have attached the Cubic Judgment.  See Tr. of Tribunal Hearing, in No. B61 (Iran-U. S. Cl. Trib., Dec. 7 and 12, 2006), App. to Brief for Respondent 37, 38–39, 41, 42.

The upshot is a dispute about the Cubic Judgment.  The United States argues (and argued before the Tribunal) that the Tribunal should set off the $2.8 million that the Cubic Judgment represents against any award that the Tribunal may make against the United States in Case No. B61.  Iran argues (and argued before the Tribunal) that the Tribunal should not set off the $2.8 million insofar as third parties have attached the Judgment.

To put the matter in terms of the language of Elahi's waiver, one can say for certain that the Cubic Judgment is "property."  And Case No. B61 itself is a "clai[m] against the United States before an international tribunal."  We can also be reasonably certain that how the Tribunal should use that property is also under dispute or in question in that claim.  Moreover, since several parties other than Elahi have already attached the Cubic Judgment, see Brief for United States as *Amicus Curiae* 20, the question whether an attached claim can be used as a setoff is potentially significant, irrespective of Elahi's own efforts to attach the judgment.

Are these circumstances sufficient to place the Cubic Judgment "at issue" in Case No. B61?  Elahi argues not. He points out that the Cubic Judgment does not appear on a list of property contained in Iran's statement of claim in

Case No. B61; nor is it the subject of any other claim before the Tribunal. Indeed, Iran and the United States do not dispute the Cubic Judgment's validity; they do not dispute the Cubic Judgment's ownership; and they do not dispute the fact that the United States' asset freeze had no adverse effect on the Cubic Judgment or on Iran's entitlement to the Cubic Judgment. As the dissent correctly points out, the Judgment is not "at issue" in any of these senses. The Judgment will neither be suspended nor modified by the Tribunal in Case No. B61, nor is the Judgment property claimed by Iran from the United States in that case, see *post*, at 2–5.

But that does not end the matter. The question is whether, for purposes of the VPA, a judgment can nevertheless be "at issue" before the Tribunal *even* when it will not be suspended or modified by the Tribunal and when it is not claimed by Iran from the United States. Here, a significant dispute about the Cubic Judgment still remains, namely a dispute about whether it can be used by the Tribunal as a setoff. And in our view, that dispute is sufficient to put the Judgment "at issue" in the case.

For one thing, we do not doubt that the setoff matter is "under dispute" or "in question" in Case No. B61, and those words typically define the term "at issue." Black's Law Dictionary 136 (8th ed. 2004). In the event that the Tribunal finds the United States liable in Case No. B61, the total sum awarded to Iran by the Tribunal will depend on whether the Judgment is used as a setoff. And whether the Judgment can be so used depends, in turn, on whether the United States is right that an attached judgment should be set off or whether Iran is right that it should not be—a matter in question before the Tribunal. In that sense, the Judgment is "under dispute." We recognize that the dispute is over the *use* of the Judgment, not the validity of the Judgment. But we do not see how that fact matters.

For another thing, ordinary legal disputes can easily encompass questions of setoff. Suppose Smith sues a carrier for wrongfully harming a shipment of goods. The question of liability, the question of damages, and the question of reducing damages through setoff may all be at issue in the case. Which is the more important issue in a particular case depends not upon the category (liability, damages, or setoff) but upon the circumstances of that particular case.

Further, the language of the statute suggests that Congress meant the words "at issue" to carry the ordinary meaning just described. Elahi essentially distinguishes between property that is the subject of a claim (a claim, for example, that the United States took or harmed particular property belonging to Iran) and property that might otherwise affect a Tribunal judgment (say, through its use as a setoff). And he argues that the statutory phrase "at issue" covers only the first kind of dispute, not the second. But the statute does not limit the property that is "*at issue* in a claim" to property that is the *subject* of a claim. To the contrary, the statute says that judgment creditors such as Elahi must

> "relinquis[h] all rights to execute against or attach property [1] that is *at issue in claims* against the United States before an international tribunal *[or]* [2] that *is the subject of awards* rendered by such tribunal." VPA §2002(a)(2)(D), 114 Stat. 1542 (emphasis added); see also §2002(d)(5)(B), as added by TRIA §201(c)(4) (cross-referencing §2002(a)(2)(D)).

Had Congress wanted to limit the property to which it first refers (namely, property that is "*at issue*" in a claim) to property that is *the subject* of a claim, it seems likely that Congress straightforwardly would have used the words "subject of"—words that appear later (in respect to awards rendered) in the very same sentence.

Finally, the statute's purpose leans in the direction of a broader interpretation of the words "at issue" than that proposed by Elahi. Pointing to the statute's legislative history, Elahi says that the statute seeks to enable victims of terrorism to collect on judgments they have won against terrorist parties. See Brief of Respondent 6–7, 31 (citing H. R. Conf. Rep. No. 107–779 (2002); 148 Cong. Rec. 23119, 23121–23123 (2002) (statement of Sen. Harkin)). He is such a victim, and, he says, Congress would have intended an interpretation that favors his cause. But Congress had a more complicated set of purposes in mind. The statute authorizes the attachment of blocked assets, and it provides partial compensation to victims to be paid (in part) from general Treasury funds. But it does so in exchange for a right of subrogation, VPA §2002(c), and for the victim's promise not to pursue the balance of the judgment by attaching property "at issue" in a claim against the United States before the Tribunal. VPA §§2002(a)(2)(D), (d)(5)(B), as added by TRIA §201(c)(4). The statute thereby protects property that the United States might use to satisfy its potential liability to Iran.

The Cubic Judgment falls into this category. It is property that the United States could use to satisfy its potential liability to Iran, but which may be unavailable for that purpose if successfully attached. With respect to the statute's revenue-saving purpose, it is difficult to distinguish between property that is the subject of a claim before a tribunal and property that is in dispute before the tribunal in respect to its use as an offset.

The dissent adds that the "better reading" of the words "at issue" is one that limits them to the "foster[ing] [of] compliance with the Government's international obligations." *Post*, at 6. We agree with this statement, but we do not see how it adds anything but new phraseology to the dissent's basic claim, namely that arguments before the Tribunal about "setoffs" do not count as "issues." To

repeat our own view of the matter, a dispute about whether one country must pay the other country more money because it cannot use particular property (because of an attachment) to satisfy an obligation raises an issue that the Tribunal must resolve, no less and no more than other issues that might be before the Tribunal in that case or other cases.

Contrary to the dissent's suggestion, *post*, at 8, there is no unfairness in our holding. Elahi could have chosen to forgo the Government's compensation scheme, and he then could have attached the Cubic Judgment, as have other terrorist victims with judgments against Iran. See Brief for United States as *Amicus Curiae* 20. But that course carried risks: Iran had challenged Elahi's notice of lien and it was uncertain whether Elahi would prevail. In 2003, while litigation over his notice of lien was pending, Elahi chose to participate in the Government's scheme. He thereby received the benefit of immediate, guaranteed partial compensation from the Government—in exchange for a promise not to interfere with property that the United States might need to satisfy potential liability to Iran. Having received $2.3 million in Government funds, there is nothing unfair about holding Elahi to the terms of his bargain.

Elahi makes several other arguments. He points to language in the TRIA (the statute authorizing attachment of blocked assets) which says: "*[n]otwithstanding any other provision of law*" the "blocked assets" of a state "shall be subject to . . . attachment in aid of execution" of a terrorism-related judgment. §201(a), 116 Stat. 2337 (emphasis added). He also points to VPA §2002(d)(4), as added by TRIA §201(c)(4), 116 Stat. 2339, which reads: "*[N]othing in this subsection* [which contains the relinquishment provision] *shall bar . . . enforcement* of any" terrorism-related "judgment . . . *against assets otherwise available* under this section or *under any other provision of law*"

(emphasis added). The first provision, Elahi argues, permits him to attach blocked assets notwithstanding the VPA's requirement that he relinquish his right to attach property "at issue" before an international tribunal; and that conclusion, he says, is reinforced by VPA §2002(d)(4). Our interpretation, he adds, would "bar . . . enforcement" of a terrorism-related judgment "otherwise available" under TRIA §201(a)—contrary to the statutory language just quoted.

But VPA §2002(d)(5) requires Elahi, in exchange for having received partial compensation, to relinquish "*all rights*" to attach property "at issue" in an international tribunal. VPA §2002(a)(2)(D), 114 Stat. 1542 (cross-referenced by §2002(d)(5)(B); emphasis added). And, as several courts of appeals have apparently assumed, the relinquishment of "all rights" includes the right given by TRIA §201(a) to attach blocked assets. See *Hegna* v. *Islamic Republic of Iran*, 376 F. 3d 226, 232 (CA4 2004); *Hegna* v. *Islamic Republic of Iran*, 380 F. 3d 1000, 1009 (CA7 2004); *Hegna* v. *Islamic Republic of Iran*, 402 F. 3d 97, 99 (CA2 2005) *(per curiam)*.

Moreover, the relinquishment provision that applies to Elahi was added to the VPA by the very same statute, the TRIA, that permitted the attachment of blocked assets, and which contains the "notwithstanding" clause upon which Elahi relies. §201(a) (blocked assets); §201(c) (amending VPA). Congress could not have intended the words to which Elahi refers to narrow so dramatically an important provision that it inserted in the same statute. And for those who, like Elahi, argue that the legislative history supports his reading of the statute, we point out that the history suggests that Congress placed the "notwithstanding" clause in §201(a) for totally different reasons, namely to eliminate the effect of any Presidential waiver issued under 28 U. S. C. §1610(f) prior to the date of the TRIA's enactment. H. R. Conf. Rep. No. 107–779, at

27.

Elahi makes three final arguments, first that setoff is not "at issue" because the United States has argued in Case No. B61 that it has no liability at all, second that set-off is not "at issue" because the United States has not formally asserted a setoff before the Tribunal, and third that the Government violated his due process rights by inadequately informing that his waiver would deprive him of his right to attach the Cubic Judgment. We find none of these arguments convincing and shall briefly indicate our reasons in summary form.

As to the first, the United States argued setoff in the alternative, thereby placing it, in the alternative, "at issue" before the Tribunal. As to the second, Elahi at most points to a ground for disputing the propriety, under Tribunal rules, for granting a setoff; he does not deny that the Tribunal sometimes can do so, see, *e.g.*, *Futura Trading Inc.* v. *National Iranian Oil Co.*, 13 Iran-U. S. Cl. Trib. Rep. 99, 115–116, ¶62 (1986) (preventing collection on a claim because the claimant had already collected the sum at issue from a different party). Hence whether the Tribunal can provide for a setoff here is a matter for the Tribunal to decide, and until it does decide, one way or the other, the matter is "at issue." As to the third, we can find nothing that shows Elahi was unfairly surprised by the scope of his waiver—certainly not to the point of violating any Due Process rights. See, *e.g.*, 14 Iran-U. S. Cl. Trib. Rep., at 278, ¶10 (dismissal of Iran's claim against Cubic was "without prejudice to any findings it may make concerning [the Cubic contract] in Case No. B61").

IV

We conclude: The Cubic Judgment was not blocked at the time the Court of Appeals reached its decision. We do not decide whether more recent Executive Branch actions would block the Judgment at present. Regardless, Elahi

has waived his right to attach the Judgment.  We reverse the judgment of the Court of Appeals.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 07–615

———————

## MINISTRY OF DEFENSE AND SUPPORT FOR THE ARMED FORCES OF THE ISLAMIC REPUBLIC OF IRAN, PETITIONER *v.* DARIUSH ELAHI

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[April 21, 2009]

JUSTICE KENNEDY, with whom JUSTICE SOUTER and JUSTICE GINSBURG join, concurring in part and dissenting in part.

I join Parts I and II of the Court's opinion but, with all respect, dissent from Parts III and IV. As to Parts I and II, the Court is correct, in my view, to hold that the Cubic Judgment was not a "blocked asset" when the Court of Appeals reached its decision. As to Parts III and IV, however, respondent Dariush Elahi has not relinquished his right to attach the Cubic Judgment. By holding otherwise, the Court departs from the plain meaning and the purpose of the statutes Congress enacted to compensate Elahi and other victims of terrorism.

## I
## A

The statutory phrase to be interpreted is "property that is at issue in claims against the United States before an international tribunal." Victims of Trafficking and Violence Protection Act of 2000 (VTVPA), §2002(d)(s), as added by Terrorism Risk Insurance Act of 2002 (TRIA), §201(c)(4), 116 Stat. 2339, note following 28 U. S. C. §1610. The context, of course, is Case No. B61—a suit by Iran against the United States that is pending before the

Iran-U. S. Claims Tribunal. The word "property," as used in the statutory phrase, surely can refer both to tangible property, such as real estate or valuables in a safe-deposit box, and to intangible property interests, such as a claim, a cause of action or, as in this case, a judgment rendered by a United States district court. Still, it must be acknowledged that the term "at issue" is neither precise nor much illuminated by its operation in cases or other statutes. The absence of any clear authority on this point makes it imperative to adopt an interpretation that accords with familiar and well-settled principles of law. In this case those principles are the rules designed to give full and proper respect to final judgments rendered by courts of competent jurisdiction.

To determine whether the Cubic Judgment is "at issue" in Case No. B61, the primary consideration must be whether the Claims Tribunal, in the exercise of its own authority and jurisdiction, can affect the ownership, disposition, or control of the property the judgment comprises. Here the property in question is a judgment rendered by the United States District Court for the Southern District of California. As all acknowledge, that court had jurisdiction over the subject and the persons then before it. And, as is further conceded, that court's judgment is valid and has binding force on Cubic Defense Systems, Inc., the nongovernmental party before that court. See *Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran* v. *Cubic Defense Systems, Inc.*, 29 F. Supp. 2d 1168, 1170 (1998). Neither party to Case No. B61 questions the judgment or requests the Claims Tribunal to interpret it—much less to alter, enforce or invalidate it.

Even if one of the parties were to ask the Claims Tribunal to modify the Cubic Judgment, the Tribunal would simply lack power to do so. The judgment arises out of Iran's contractual dispute with Cubic, an American company, and the Tribunal has no "jurisdiction over claims by

Iran against United States nationals." *Ministry of Nat. Defence of Islamic Republic of Iran* v. *United States,* 14 Iran-U. S. Cl. Trib. Rep. 276, 278 (1987) (Case No. B66). Iran tried to sue Cubic in the Claims Tribunal 20 years ago, but the Tribunal dismissed that suit for lack of jurisdiction. *Ibid.* In these circumstances the Cubic Judgment is simply an extrinsic fact beyond the Claims Tribunal's power to affect. True, the Tribunal, when it enters its own orders, might or might not give credit to the United States for a payment, or a right to payment, arising out of the Cubic Judgment; but that does not put the judgment itself at issue.

B

Even if the Court's broad reading of the phrase "at issue" were correct, the Court's conclusion would still be wrong because the relinquishment provision is limited to property that is at issue "in claims against the United States." And the Cubic Judgment is not part of the claims Iran makes in Case No. B61, as both Iran and the United States have made clear in their submissions to the Claims Tribunal. To put the countries' filings in context, a brief review of both the Cubic Judgment and Case No. B61 is necessary.

The Cubic Judgment is the result of a contract dispute between Iran and Cubic. In the late 1970's, Iran hired Cubic to build an air combat training system, and advanced some $12 million for the project. But Iran failed to make all the payments due. App. 43–44. Thus rebuffed, Cubic sold the system to Canada and refused to refund any of Iran's advance payments. Iran brought an arbitration against Cubic. The panel of arbitrators, after ascertaining Cubic's costs of building the system, and after allowing the company a reasonable profit of $3.5 million, ordered Cubic to return to Iran $2.8 million of the $12 million advance. Iran brought this arbitration award to

the U. S. District Court for the Southern District of California, which issued the judgment at issue here. The judgment orders Cubic to pay Iran $2.8 million. *Cubic Defense Systems*, *supra*, at 1171, 1174.

Case No. B61 is in essence a contract dispute between Iran and the United States. Iran accuses the United States of breaking its promise, made in the Algiers Accords, to "arrange . . . for the transfer to Iran of all Iranian properties" located in the United States on January 19, 1981. 20 I. L. M. 224, 227, ¶9 (1981). One of the properties Iran claims is Cubic's air combat training system. See Statement of Claim in No. B61, (Iran-U. S. Cl. Trib.), App. to Brief for United States 22a, 24a, 31a. Both parties have confirmed, in their joint report describing all the "property claimed by Iran," that Cubic's system is "at issue" in Iran's claims. Cover Letter to Final Joint Report (July 14, 1989), App. to Brief for Respondent 14.

But the Cubic Judgment, in contrast to Cubic's training system, is not part of Iran's claims in Case No. B61. Both countries made this clear in their submissions to the Tribunal. Their joint report does not list the Cubic Judgment among the properties "at issue." Final Joint Report (July 14, 1989), App. to Brief for Respondent 15–23. And, in a statement altogether consistent with that omission, Iran told the Tribunal that "[t]he subject matter of [Case No. B61], at variance with the [arbitration] action [against Cubic], is the losses suffered by Iran as a result of the United States' non-export of Iranian properties." Iran's Statement 16, App. 73, 76. The United States agreed, stating that the "only 'property that' . . . is properly at issue" in Case No. B61 is property that "'has already been made the subject of a claim'" by Iran against the United States. U. S. Rebuttal (Sept. 1, 2003), 1 Lodging p. L419 (emphasis deleted) (Sealed). The United States reaffirmed this position in oral argument before the Tribunal: "Any losses in relation to [the Iran-Cubic] contract are not re-

coverable against the United States and issues regarding losses under that contract do not belong before this Tribunal." Tribunal Hearing 124 (Dec. 12, 2006), App. to Brief for Respondent 42.

Because the Claims Tribunal lacks jurisdiction over the Cubic Judgment, and because that judgment is not part of Iran's claims against the United States in Case No. B61, the judgment is not "property that is at issue in claims against the United States" under the plain meaning of the TRIA's relinquishment provision. TRIA §201(c)(4), 116 Stat. 2339 (amending VTVPA §2002(d)).

## II

Even if the text of the relinquishment provision were somehow ambiguous—and it is not—then the purpose of the VTVPA and TRIA would tip the scales in Elahi's favor. The text and the evident purpose of those statutes demonstrate that Congress' primary purpose was to compensate the victims of terrorism, not to secure from those victims a relinquishment of their claims to property owned by entities found to have sponsored terrorism.

The text of the VTVPA, and of the amendments made to it by the TRIA, shows that Congress' primary purpose was to enable the victims of terrorism to execute on the assets of a state found to have sponsored or assisted in a terrorist act. In the first subsection of the TRIA concerning the attachment of state assets by victims of terrorism, Congress provided that "[n]otwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism . . . the blocked assets of that terrorist party . . . shall be subject to execution or attachment in aid of execution in order to satisfy such judgment . . . ." TRIA §201(a), *id.,* at 2337. The effect of this subsection is to ensure that other laws do not bar victims' efforts to enforce judgments against terrorist states. To like effect is

another paragraph of the VTVPA concerning victims of Iranian terrorism. Entitled "Statutory Construction," this paragraph reads: "Nothing in this subsection shall bar, or require delay in, enforcement of any judgment to which this subsection applies under any procedure . . . ." §2002(d)(4), as added by TRIA §201(c)(4), *id.*, at 2339. Though neither provision refers in direct terms to the relinquishment provision, both provisions show Congress' intent to broaden, rather than limit, the rights of victims like Elahi to execute on property owned by state sponsors of terrorism. Yet the opinion issued by the Court today does just the opposite.

To contravene the statute's clear design, the Court surmises that Congress also had a "more complicated" purpose, namely, to "protec[t] property that the United States might use to satisfy its potential liability to Iran." *Ante*, at 17. This imagined purpose, the Court says, requires us to read the relinquishment provision as broadly as possible so as to prevent victims of terrorism from attaching property. But the Court does not point to evidence of this putative purpose, aside from the text of the relinquishment provision itself—a text which, as submitted above, the Court reads the wrong way.

The better reading of the relinquishment provision—and one much more consistent with Congress' protective purpose—is not as a "revenue-saving" device, *ibid.*, but as a way to foster compliance with the Government's international obligations. If Iran has asked the Claims Tribunal to resolve the status of certain property, then Iran and the Tribunal may well take the position that the United States has a responsibility under the Algiers Accords to prevent U. S. nationals from executing against that property. That concern is not present in this case. The ownership of the Cubic Judgment is not disputed, and allowing Elahi to attach it will not affect Iran's right to obtain full recovery from the United States in Case No. B61. At

most, the attachment might affect the right of the United States to use the judgment to offset its liability.

The Court purports to agree with this reading of the statute's purpose. *Ante*, at 17. But that agreement is hard to square with the Court's insistence upon fulfilling what it sees as the statute's "revenue-saving purpose." *Ibid.* If the Court did in fact believe that the "'better reading'" of the statute's purpose, *ibid.*, is to foster compliance with the United States' international obligations, then the Court would affirm the judgment of the Court of Appeals. Elahi's attachment of the Cubic Judgment does not hinder the U. S. Government's efforts to comply with its obligations under the Algiers Accords. At Algiers, the United States agreed to "arrange . . . for the transfer to Iran of all Iranian properties" located in the United States. 20 I. L. M., at 227, ¶9. That is not an obligation to pay Iran money, as the Court seems to believe. See *ante*, at 17. It is instead an obligation to take specific action in regard to specific properties. These specific properties do not include the Cubic Judgment—as the Court concedes. See *ante*, at 9 (holding that the Cubic Judgment was not blocked). Therefore, Elahi's attachment of the Cubic Judgment does not impede the United States' efforts to make good on its obligations under the Algiers Accords.

To be sure, a judicial lien on one of the specific properties referenced by the Algiers Accords might make it difficult for the U. S. Government to comply with its obligations, under those Accords, to arrange for that property's transfer to Iran. By encouraging creditors such as Elahi to give up their liens on these specific properties that are subject to the Algiers Accords, the TRIA makes it easier for the Government to comply with its obligation to "arrange . . . for the transfer" of these properties to Iran. This purpose (fostering compliance with the United States' obligation under the Algiers Accords) is more in keeping with the statute's text than is the Court's "revenue-saving"

purpose. And this purpose—that is, the purpose of ena-
bling the United States to meet its obligations under the
Algiers Accords—is not in the least frustrated by permit-
ting Elahi to attach the Cubic Judgment, a property
that, as the Court concedes, is not subject to the Algiers
Accords.

## III

The facts of this case show the injustice of the Court's
interpretation. The Court today puts an end to Elahi's
decade-long quest to hold Iran to account for murdering
his brother Cyrus. In 2000, Elahi won a wrongful-death
lawsuit against Iran and was awarded some $6 million in
compensatory damages. See *Elahi* v. *Islamic Republic of
Iran*, 124 F. Supp. 2d 97 (DC). In April 2003, Elahi took
what he must have considered a further step toward his
goal when he accepted $2.3 million from the U. S. Gov-
ernment under the VTVPA.

After today's ruling, what once appeared Elahi's gain of
$2.3 million now seems to be a loss of $500,000. By taking
the VTVPA's $2.3 million, the Court holds, Elahi relin-
quished his right to the $2.8 million Cubic Judgment he
had already attached. The practical effect of the Court's
ruling is to turn the purpose of the VTVPA on its head.
Rather than further Elahi's effort to obtain compensation
for the murder of his brother, the Act has instead set him
back half a million dollars. For the reasons given above,
this result was not what Congress intended when it
passed the VTVPA.

## IV

Congress passed the Victims of Trafficking and Violence
Protection Act and the Terrorism Risk Insurance Act to
compensate victims of terrorism. Congress expressed this
purpose both in the text of the principal provision inter-
preted here and in accompanying sections of the statute.

Opinion of KENNEDY, J.

By stripping Elahi of his right to attach the valid judgment against Cubic rendered by the District Court—a judgment not before the Claims Tribunal in any sense—the Court fails to give the statute its intended effect. These reasons explain my respectful dissent.